Earl ROBINSON, Plaintiff-Appellant,

v.

John E. BERGSTROM,
Defendant-Appellee.

No. 76–1620.

United States Court of Appeals,
Seventh Circuit.

Submitted May 16, 1978.

Decided June 13, 1978.

**402**

Professor Robert H. Dreher, Director, Prison Legal Aid Program, Carbondale, Ill., for plaintiff-appellant.

John C. Bergstrom, Urbana, Ill., for defendant-appellee.

Before CUMMINGS, PELL and WOOD, Circuit Judges.

PER CURIAM.

Earl Robinson appeals from an order dismissing his civil rights complaint brought under 42 U.S.C. § 1983. The district court found that the defendant was not acting under color of state law when he allegedly violated the constitutional rights of the plaintiff. Accordingly, no jurisdiction was found to exist under § 1983. Although defendant-appellee appeared and testified in the district court, he has not filed a responsive pleading in this appeal. Therefore the appeal, by order of this Court,[1] is considered without oral argument pursuant to Circuit Rule 8(c) and Rule 2, Fed.R. App.P.

Earl Robinson was convicted of murder on September 27, 1968, by a jury in Champaign County, Illinois. At trial he was represented by the defendant John C. Bergstrom. Bergstrom, at that time, acted as a part-time Assistant Public Defender for Champaign County, while also carrying on a private practice. He was compensated for his duties as a Public Defender. There was apparently no full-time defender office in Champaign County at this time.

Bergstrom was appointed, in his capacity as Assistant Public Defender, to represent Robinson on appeal. From the time of his appointment until January of 1973 Bergstrom did little, other than file notice of appeal and designate the trial record, to prosecute Robinson's appeal. Bergstrom apparently visited Robinson in prison twice in 1972. Bergstrom testified that the primary reason for the delay was due to an error in his judgment regarding his caseload. He also testified that he carried a caseload of from six to nine hundred cases per year during this time. Apparently after Bergstrom resigned his position in 1973 Champaign County appointed a full-time public defender. In 1973 an appellate brief was ultimately prepared by the then newly established Illinois State Appellate Defender's Office. That brief was filed in May of 1974. On November 27, 1974, plaintiff's appeal was denied.

---

1. Dated June 3, 1977.

Robinson contends that because of the delay of five and one-half years between conviction and the filing of an appellate brief he was denied access to various prison programs. He also argues that he was prevented from filing a federal habeas corpus petition because of failure to exhaust his state remedies.

In early 1973, prior to the appointment of the State Appellate Defender, Robinson filed a section 1983 suit alleging that Bergstrom, acting under color of state law, misused the power invested in him by state law to deprive Robinson of rights under the Sixth and Fourteenth Amendments to the Constitution. The district court dismissed the suit for want of subject matter jurisdiction. On appeal, this Court vacated and remanded the cause for a hearing, stating that it was arguable that a public defender acts under color of state law and therefore subject matter jurisdiction may exist, citing *John v. Hurt,* 489 F.2d 786 (7th Cir. 1973). *Robinson v. Bergstrom,* No. 73–1401 (7th Cir. March 12, 1974) (Unpublished Order).

On remand, both the plaintiff and defendant appeared and testified. The district court entered a memorandum opinion and order dismissing the action on the basis that the defendant was not acting under color of state law when he represented plaintiff as a public defender. The plaintiff appeals from that order.

## I.

It may appear appropriate to consider initially whether the defendant, as a public defender, is immune from a section 1983 damage claim for acts done in the performance of his judicial function as a public defender. Indeed, it is the law of three of the federal circuits that such actions be dismissed on this basis. *Miller v. Barilla,* 549 F.2d 648 (9th Cir. 1977); *Minns v. Paul,* 542 F.2d 899 (4th Cir. 1976); *Brown v. Joseph,* 463 F.2d 1046 (3d Cir. 1972), *cert.*

*denied,* 412 U.S. 950, 93 S.Ct. 3015, 37 L.Ed.2d 1003. The Tenth Circuit Court of Appeals has taken the position that a public defender, in representing an indigent, does not act under color of state law and therefore the federal court must dismiss the action. *Espinoza v. Rogers,* 470 F.2d 1174 (10th Cir. 1972). Various district courts · have also ruled that a public defender does not act under color of state law and have therefore dismissed the complaint for lack of jurisdiction. *See, e. g., Clark v. Brandom,* 415 F.Supp. 883 (W.D.Mo.1976); *Berryman v. Shuster,* 405 F.Supp. 1346 (W.D. Okla.1975); *Sanchez v. Murphy,* 385 F.Supp. 1362 (D.Nev.1974); *Hill v. Lewis,* 361 F.Supp. 813 (E.D.Ark.1973); *U. S. ex rel. Wood v. Blacker,* 335 F.Supp. 43 (D.N.J. 1971).

Apparently this Circuit has had only one occasion to consider the section 1983 liability of a public defender. In *John v. Hurt,* 489 F.2d 786 (7th Cir. 1973) (per curiam), an indigent state prisoner filed a *pro se* complaint alleging that the Public Defender of Macon County, Illinois, had deprived him of his Sixth Amendment rights. The district court had dismissed the action, holding that the defendant could not be said to have acted under color of state law. On appeal, this Court did not specifically rule on the color of state law question. Rather, it was there held that

> [a]ssuming . . . that defendant could be deemed to be acting under color of state law . . . we think that, as a matter of law, defendant is immune from liability for damages, and plaintiff's complaint must fail. *Id.* at 788.

The immunity discussed by this Court in *John* was held to be a qualified immunity, likened to that of state prosecutors.[2]

Although *John* possibly could have formed the basis of the district court's holding, the court ruled on the basis of state

---

2. The Supreme Court in 1976 held that state prosecutors, in initiating a prosecution and presenting the state's case, are absolutely immune from claims under section 1983. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47

L.Ed.2d 128. Whether this holding might affect the rationale of the *John* analogy need not be determined at this point and will be discussed *infra.*

action.[3]  Upon analysis, it was proper to rule on the color of state law question prior to consideration of immunity.  While the *John* court, as well as the holdings in *Miller v. Barilla, supra,* and *Minns v. Paul, supra,* imply the concept of alternative election of disposition of such a case, such an election is not correct.[4]

There appears to be no question that the requirement of "state action" in a section 1983 claim is an essential jurisdictional predicate.  *Cannon v. Univ. of Chicago,* 559 F.2d 1063 (7th Cir. 1976); *Braden v. Univ. of Pittsburgh,* 552 F.2d 948 (3rd Cir. 1977) (en banc).  Accordingly, where state action is found lacking, the section 1983 complaint is properly dismissed for lack of subject matter jurisdiction.  *Cannon, supra.* Alternatively a question of whether a defendant is immune, either qualifiedly or absolutely, is not a jurisdictional issue. Rather, immunity is an affirmative defense which may defeat the section 1983 claim once that subject matter jurisdiction has been established.  *See, e. g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Larsen v. Gibson,* 267 F.2d 386 (9th Cir. 1959).[5]

It is elementary that jurisdiction is a threshold issue, whether or not raised by a party, which must be satisfied prior to the merits.  *Haley v. Childers,* 314 F.2d 610 (8th Cir. 1963).

It is therefore obvious that the state action question, a requirement for subject matter jurisdiction, must be weighed prior to a consideration of immunity.

## II.

Having found that we may not properly take the course followed in *John v. Hurt, supra,* of electing to consider the claim on immunity grounds, we must determine whether the public defender acted under color of state law.  To do this, it is necessary to examine carefully whether state action under section 1983 encompasses the peculiar relationship of an indigent defendant in a criminal proceeding and his appointed public defender.

An appropriate starting point in such an analysis is the language of this Court in its earlier order in this case where it was noted that, at least arguably, a public defender acts under color of state law in representing an accused indigent.  We there observed that the decision in *John v. Hurt, supra,* may be applicable.  The discussion in *John* fairly presents the two sides to this issue. On the one hand it was recognized that the public defender, after appointment, has a professional relationship with his client similar to that of a private attorney and is merely compensated by the state.  *Id.* at 787.  On the other hand, the Court observed that the public defender ordinarily enjoys continuing employment by a unit of state government, is often furnished an office as well as compensation, and appears to his client, as well as others, as a person cloaked with the authority of the state.  *Id.*

Although the language of *John,* as well as *U. S. v. Senak,* 477 F.2d 304 (7th Cir. 1973), a case concerned with the criminal counterpart of § 1983 (18 U.S.C. § 242),[6] involves discussions of whether a public defender acts under color of state law, both

---

**3.**  The terms "state action" and "under color of state law" are used interchangeably, as they have been held to mean the same thing.  *See United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267.

**4.**  In *Minns,* the district court had dismissed the complaint on the ground that the requisite state action was lacking, and the court of appeals affirmed on different grounds.  *Id.* at 900.  In *Miller,* the Ninth Circuit Court of Appeals decided it was not necessary to decide the color of state law issue in view of its holding based on absolute immunity.  *Id.* at 650.

**5.**  A somewhat analogous situation is found where the federal district court stays a proceeding based on abstention prior to a determination of federal jurisdiction.  This Court has held that in that instance a federal court cannot abstain until it is satisfied as to its jurisdiction.  *Miller-Davis Co. v. Illinois State Tollway Highway Authority,* 567 F.2d 323 (7th Cir. 1977).

**6.**  The test for state action is the same under section 242 and section 1983.  *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152 n. 7, 90 S.Ct. 1598, 26 L.Ed.2d 142.

discussions are dicta, and therefore were not binding on the district court. The *John* Court relied on the Tenth Circuit holding in *Espinoza v. Rogers,* 470 F.2d 1174 (10th Cir. 1972) (per curiam). The court in *Espinoza* found that while state statutes created and provided a means of funding for the public defender office, the statutes "in no way attempt to control or otherwise influence the professional judgment of a lawyer employed as a public defender." *Id.* at 1174–5. Citing various precedent, the court held that an attorney does not act under color of state law simply because he has accepted employment as a Colorado Public Defender.

One of the cases relied on in *Espinoza,* and apparently a seminal case concerning the public defender-state action issue, is *Peake v. County of Philadelphia,* 280 F.Supp. 853 (E.D.Pa.1968). A convicted prisoner there claimed that members of the "Voluntary Defenders Association" had violated his constitutional rights. The district court found that the association was funded in part by the state but did not possess any power by virtue of state law. It was therefore held the defendants had not acted under color of state law, as required by section 1983.

Similarly, in *Thomas v. Howard,* 455 F.2d 228 (3rd Cir. 1972) (per curiam), another case relied on by the *Espinoza* court, the defendant was an attorney who had voluntarily represented the section 1983 plaintiff in prior post-conviction proceedings. Defendant Howard had been selected from a pool of attorneys who had volunteered for such duty through "Essex County Legal Aid—Criminal Division". Again this was held not to be state action under section 1983.

Both *Peake* and *Thomas* differ from the factual situation in *Espinoza* and in the instant case. *Peake* and *Thomas* both involve private attorneys who had volunteered to be appointed by the court to represent indigent criminal defendants. Both Bergstrom and the defendant in *Espinoza* were paid employees of a state governmental unit. This factor is important, for private attorneys appointed to defend indi-

gents have regularly been held not to be acting under the color of state law. *French v. Corrigan,* 432 F.2d 1211 (7th Cir.), *cert. denied,* 401 U.S. 915, 91 S.Ct. 890, 27 L.Ed.2d 814 (1970); accord, *O'Brien v. Colbath,* 465 F.2d 358 (5th Cir. 1972); *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1970); *Mulligan v. Schlachter,* 389 F.2d 231 (6th Cir. 1968). As stated in *French,* the distinguishing factor is that the appointed attorneys "were not functionaries of the state but were proceeding in their private capacity." *French, supra* at 1214.

Thus being a state functionary or an employee of a state instrumentality must be considered an important factor and prevents using cases such as *French* as precedent for the proposition that a state public defender does not act under color of state law.

Although the district court agreed that *Espinoza* applied, two of the three cases on which that holding is founded are factually distinguishable. And while the district court may be correct in stating that the state has no right to direct the manner in which the public defender represents his client, the fact that Bergstrom is employed by a state instrumentality—here the county public defender's office—may be a sufficient basis to hold that state action is present. To make this determination it is necessary to look beyond the few cases concerned with public defenders to those relating to the state action question under different circumstances.

Most of the cases dealing with the state action issue involve claims against ostensibly private institutions, instrumentalities, or persons, which are alleged to be subject to a section 1983 claim because of extensive state regulation or statutory delegation of a public function, *e. g., Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477, or significant financial assistance, *e. g., Cannon v. Univ. of Chicago, supra,* or because of conspiracy with state officials, *e. g., Potenza v. Schoessling,* 541 F.2d 670 (7th Cir. 1976). *See generally,* Note, *State Action in the Seventh Circuit,* 59 Marq.L.Rev. 809 (1976). The difficulty

with an analysis of the situation here is that we are presented with the reverse argument, that an employee of a clearly state-related instrumentality is not acting under color of state law because he exercises a private function. It appears, therefore, that the "unitary nexus" test enunciated in *Jackson v. Metropolitan Edison Co., supra,* or any test involving an ostensibly "private" defendant, see *Cannon v. Univ. of Chicago, supra,* may not be proper in this context. The "nexus" test requires not only proof of significant state regulation but also that there be a sufficiently close nexus between the challenged action and the state. If this test is applied in the public defender context it is possible, because of the latter requirement, that a public defender could be held not to be acting under color of state law.

A recent line of cases in the Third Circuit provides guidance in determining whether the test utilized in *Jackson* is applicable in this instance. In *Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382 (3d Cir. 1976), defendants were the board members of a library which was found to be 90 per cent funded by the state. Acknowledging that there has been no all-inclusive state-action test enunciated by the Supreme Court, the court determined the *Jackson* nexus test to be inapplicable. Rather, it was found under *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 that the state's extensive participation in the comprehensive program obviated the need to show involvement in the specific challenged activity.

In *Burton* a private party had leased a portion of an auto parking facility owned by the state for the purpose of operating a restaurant. The Court held that when a state leases public property in this manner, compliance with the proscriptions of the Fourteenth Amendment is necessary. Applying *Burton,* the Third Circuit in *Hollenbaugh* found that because there was an explicit statutory representation that the library was to act as an agent of the school

district and city in providing library service, the state action requirement was met.

In *Braden v. Univ. of Pittsburgh,* 552 F.2d 948 (3d Cir. 1977) (en banc), the court again found the *Jackson* test inapplicable, and instead applied the rationale of *Burton* in determining whether the defendants, the University of Pittsburgh and its chancellor, were liable under section 1983. The court held that *Burton* and *Jackson* stand as two models of state-action analysis, with the applicability of either approach resting on the type of setting which may be present. *Braden, supra* at 958. Because the University was, statutorily, a "state instrumentality" and a "State-related institution", *Id.* at 959, inextricably related to the state, *Burton* applied and no affirmative connection between the state and the challenged acts was required.

In the recent case of *Chalfant v. Wilmington Institute,* 574 F.2d 739 (3d Cir. 1978) (en banc),[7] the Third Circuit clarified the rule it appears to have been developing in *Braden* and *Hollenbaugh.* In *Chalfant,* a section 1983 action, some defendants were board members of a free public library and the plaintiff a terminated employee who alleged various injuries amounting to deprivations of constitutionally protected rights. The library was substantially funded by the county, although it also received investment income from a private endowment as well as gifts from private donors. The management of the library was directed by a "Board of Managers", a majority of whom were unpaid private citizens. The Board of Managers apparently exercised complete control over expenditure of funds, as well as the daily operation of the library. The firing involved was the result of actions taken by "private citizen" members of the Board.

The district court, relying on the holding of *Jackson v. Metropolitan Edison Co., supra,* that mere governmental involvement in a "public function", without the necessary nexus between the challenged action and the state, is insufficient to predicate a

---

7. Additional underlying facts, incorporated by reference in the 3rd Circuit opinion, are found in *Trivits v. Wilmington Institute,* 417 F.Supp. 160, 163–65 (D.Del.1976).

finding of state action, held that the dismissal was not the result of state action. *Trivits, supra* at 165. On appeal, upon rehearing en banc, the Third Circuit reversed. The court held the test applied in *Jackson* to be inapplicable in this context, reasoning that

> [t]he *Jackson* nexus test, whatever it means in the context of the activities of what the Supreme Court considers to be private enterprises, cannot be applied mechanically in other contexts. *Chalfant, supra,* at 745.

In addition, the court found that its earlier decisions in *Hollenbaugh v. Carnegie Free Library, supra,* and *Braden v. University of Pittsburgh, supra,* held that the status of the individual actor is irrelevant if the institution on whose behalf he acted is found, upon an examination of all the relevant factors, to be an instrumentality of a state or local government. The relevant determination therefore was not the degree of state financial or other involvement, but solely whether the individual acted on behalf of a state instrumentality.

The *Chalfant* court, on the basis that the library was funded by tax revenue, that a state statute defined the services and structure of the library, and because the library was situated on city-owned property, found the library to be an instrumentality of state government.

The *Chalfant* court's analysis, distinguishing the test applied where the defendant is a private enterprise versus where the defendant acts on behalf of a state instrumentality, is convincing in both the logical and legal sense. This reasoning easily fits within the bounds of the general rule that "an individual's conduct is engaged in under color of law if clothed with the authority of the state and purporting to act thereunder, whether or not the conduct complained of was authorized." *Robert v. Acres,* 495 F.2d 57 (7th Cir. 1974), citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495.

The reasoning is further supported by the language of this Court in *Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir. 1975). There Judge Stevens (now Justice), writing for the Court, emphasized that the defendant university could not be liable under a section 1983 claim because there was no "evidence that [I.I.T.] is a State instrumentality." *Id.* at 824–25. Had there been such evidence, it is likely that state action would have been found regardless of a state connection with the challenged acts.

An analogy may also be made to the case of a section 1983 claim against a doctor. In *Robinson v. Jordan,* 494 F.2d 793 (5th Cir. 1974) (per curiam), a county health officer, a doctor, was sued as the result of medical treatment of a prisoner in the county jail. The Fifth Circuit held that because the plaintiff had no option to choose another doctor because of his incarceration pending trial, the doctor acted under color of state law for purposes of section 1983. The court made this holding despite the fact that the state does not directly interfere with the doctor's exercise of professional judgment. Similarly, the indigent prisoner, here Robinson, if he desired counsel, had no choice but to accept Bergstrom as his counsel.

Clearly, the Champaign County Public Defender is as much, if not more, of an instrumentality of the state as the library in *Chalfant.* Under an Illinois statute, in effect at the time of the acts complained of,[8] the county public defender offices are established, compensation is permitted to be provided by the county, and offices are provided. The Champaign County Public Defender Office is plainly an instrumentality of the state. Under the *Chalfant* analysis, this finding establishes state action. In *Chalfant* a private citizen, unpaid for his duties, was held to be acting under color of law because he acted on behalf of a state instrumentality. Similarly Bergstrom, a compensated employee of the county public defender's office, acted on behalf of a state instrumentality. In view of the office's inextricable relation to the state, no proof

---

8. Ill.Rev.Stat. ch. 34, §§ 5601–5609. This act was passed in 1933 and amended in 1949.

that the challenged acts are related to the state is necessary. The fact that the Public Defender is a state instrumentality is sufficient to show state action. In view of this, as well as this Court's earlier discussions in *John v. Hurt, supra,* and *United States v. Senak, supra,*[9] we hold that the defendant Bergstrom acted under color of state law throughout his representation of the plaintiff.

## III.

Having determined that state action existed, and therefore that the district court could have exercised jurisdiction, it is necessary to review the record to determine if remand is necessary. In view of the extensive evidentiary hearing conducted by the district court, this Court may determine whether, as a matter of law, the defendant is immune from liability from a claim arising under section 1983.

In *John v. Hurt,* 489 F.2d 786 (7th Cir. 1973) (per curiam), we held that "public defenders, like state prosecutors, and state and city attorneys, enjoy a qualified immunity for acts performed in the discharge of their official duties." *Id.* at 788. Although there is no extensive discussion of the analogy to the state prosecutor in *John,* it is clear that that panel perceived similar policy reasons for extending immunity to the state public defender. Although the Third Circuit had previously allowed absolute immunity under these circumstances, *Brown v. Joseph,* 463 F.2d 1046 (3rd Cir. 1972), the *John* Court cited the decision for the underlying policy, noting

> that the extension of immunity to public defenders will encourage their free exercise of discretion in the performance of professional obligations, as well as aid in the recruitment of able men and women for public defender positions. *John, supra* at 788.

Developments in the law since *John* prompt further analysis of the question of extension of immunity to the public defender. The first major development affecting this Court's earlier ruling is the case of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128. In *Imbler* the Supreme Court extended absolute immunity from liability under section 1983 to public prosecutors. In view of the fact that the *John* decision likened the policy considerations for prosecutorial immunity to a public defender's circumstance, the potential application of *Imbler* is readily apparent. Indeed two other circuits have followed just such an analogy in holding public defenders absolutely immune since *Imbler. Miller v. Barilla,* 549 F.2d 648 (9th Cir. 1977); *Minns v. Paul,* 542 F.2d 899 (4th Cir. 1976).[10]

In the recent case of *Miller v. Barilla, supra,* the court held that a public defender should be accorded absolute immunity from section 1983 damage claims for acts done in the performance of his judicial function as a public defender. The *Miller* holding relied on the earlier cases of *Brown v. Joseph,* 463 F.2d 1046 (3rd Cir. 1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3015, 37 L.Ed.2d 1003, and *Minns v. Paul, supra. Brown* had held that there was no reason to grant a state prosecutor absolute immunity, and fail to grant the same type of immunity to a public defender. The *Minns* court, agreeing with the *Brown* conclusion, noted that both *Brown* and our holding in *John*

> correctly identify the policy reasons which support a rule of absolute immunity: (a) the need to recruit and hold able lawyers to represent indigents—both full and part-time public defenders, . . . and (b) the need to encourage counsel in the full exercise of professionalism, . . . *Minns, supra* at 901.

These are indeed important and convincing reasons why absolute immunity should

---

**9.** See also the discussion, in dictum, of whether a public defender acts under color of state law, in *Caruth v. Geddes,* 443 F.Supp. 1295, 1300–01 (N.D.Ill.1978).

**10.** The fact situation in *Minns* differs from that presented here in that the defendant was a

private court-appointed attorney rather than a state employed public defender, as is the case in *Miller.* Although the facts in *Minns* differ, the policy considerations discussed are applicable, as discussed *infra.*

be granted to a public defender. To determine whether these considerations warrant the extension of the absolute immunity granted the public prosecutor in *Imbler* to a public defender it is necessary to look at the underpinnings of the *Imbler* holding.

The *Imbler* Court, in extending section 1983 absolute immunity to public prosecutors, did so by using a two-step inquiry, noting that the section 1983 immunities granted in the past "were not products of judicial fiat." *Id.* 424 U.S. at 421, 96 S.Ct. at 990. The Court set forth the inquiry to be made in determining whether section 1983 absolute immunity should be extended to particular state officials by reviewing the processes it had previously utilized. The *Imbler* Court found that "each was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Id.* at 421, 96 S.Ct. at 990. It appears appropriate to use this dual-level inquiry in the public defender context.

The first level of inquiry made by the Court in *Imbler* was a consideration of the immunity historically accorded the relevant official. The Court reviewed the common-law history involving tort actions against public prosecutors. It was found that there was a well-settled rule of immunity for a prosecutor extending back to 1896 [11] based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. Those considerations were found to include harassment by unfounded litigation deflecting the prosecutor's energies from his public duties as well as the possibility that he would shade his decisions instead of exercising the independence of judgment required.

■ Although this first inquiry was useful in analyzing the prosecutorial immunity question, it cannot be utilized to determine whether the public defender should be granted absolute immunity. The reason for this is that there simply is no history of common-law immunity of public defenders. Such was the finding of the court in *Minns*. The public defender office is a creature of recent origin, the outgrowth primarily of a Supreme Court opinion, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, requiring the appointment of counsel for indigent defendants.[12] It does not appear that this lack of common-law history dictates a finding that absolute immunity should not be extended to a public defender. Although utilized as an important inquiry, the method presented in *Imbler* is not set forth as a mandatory test. Indeed, the Court heavily stressed policy considerations underlying the common-law cases which are similarly applicable here. *Imbler, supra* 424 U.S. at 423–4, 96 S.Ct. 984.

■ It is therefore necessary, under the *Imbler* analysis, to turn to the second level of inquiry, more heavily stressed by the Court in *Imbler*, involving considerations of public policy. In our earlier decision in *John v. Hurt, supra*, as previously mentioned, two major considerations—encouragement of free exercise of discretion and recruitment of persons for public defender positions—were found to support the need for immunity. Both the *Minns* and *Miller* courts found these reasons, particularly in view of the intervening *Imbler* decision, sufficient to extend absolute immunity to public defenders. The *Minns* decision particularly stressed the policy considerations arising out of the unique relationship between the indigent and the public defender. Those considerations involve the exercise of complete professionalism and include "the unfettered discretion, in the light of their training and experience, to decline to press the frivolous, to assign priorities between indigent litigants, and to make strategic decisions with regard to a single litigant as to how best his interests may be served." *Minns, supra* at 901. These kinds of deci-

---

11. *Griffith v. Slinkard*, 146 Ind. 117, 44 N.E. 1001 (1896).

12. Public defender offices were permitted to be funded by state funds prior to 1963, *see, e. g.,* note 8, *supra*, but there was no mandatory requirement. Thus, as was the situation here, the offices were usually part-time or non-existent prior to the *Gideon* decision.

sions, while similar to those of a prosecutor, are not of quasi-judicial nature as are those of the prosecutor. Yet these considerations set the public defender apart from other state agents and officials as well.

The *Minns* court, in analyzing the special nature of the public defender-defendant relationship, found the difference between that relationship and the typical attorney-client relationship to be a compelling reason for granting absolute immunity to a public defender. The court noted that the public defender has virtually no control over which clients he will accept or reject. The public defender, given the usual heavy caseload, must therefore make many strategic decisions with which the defendant may disagree. If convicted, even where the conviction is upheld, the defendant may nevertheless bring a frivolous section 1983 action against the public defender. As the *Minns* court noted

> [t]he experience of the federal courts in federal habeas corpus and § 1983 litigation demonstrates that indigents more frequently attempt to litigate claims which are patently without merit than do non-indigent parties. *Minns, supra* at 902.

Although, at first glance, immunity appears to discriminate in favor of those defendants who were able to afford retained counsel in a criminal proceeding, that is not the case. No subsequent civil rights suit could be brought against the private attorney. A private attorney would not be acting under color of state law and therefore a section 1983 claim would be foreclosed. This particular relationship which requires a finding that a public defender acts under color of state law while acknowledging that the public defender has much the same relationship with the indigent client as a retained attorney has with his client defines a unique position for the public defender in relation to section 1983. Put in this light, the public defender position is distinguishable from other state official positions such as those connected with the executive branch. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (granting

qualified immunity to members of the executive branch of state government where the act is within the scope of their duties.).

It is thus apparent, utilizing the *Imbler* approach, that there are strong policy considerations—reflected by this Court in *John* and in the more recent *Minns* and *Miller* holdings—which justify extending absolute immunity to the public defender. In addition there are other considerations which differentiate the public defender from most other state officers or officials. In particular, the indigent who is convicted as the result of the failure of his public defense attorney to provide the minimum level of counsel has a number of alternative remedies. He may raise the issue of ineffective assistance of counsel in a motion for a new trial or on appeal, where he may have a different counsel appointed. Upon exhaustion of any additional state collateral remedies, he may file a petition for a writ of habeas corpus in federal court. *See Brown, supra* at 1049 and *Minns, supra* at 902.

Although the argument can be made that a grant of absolute immunity shielding a public defender will cause less incentive to provide the most effective defense, other "incentives" do exist. Firstly, all attorneys are bound to represent a client zealously within the bounds of the law. Canon 7, A.B.A. Code of Professional Responsibility. Failure to do so can result in disciplinary action. Another major factor which deters misconduct which may deprive a defendant of his Sixth Amendment right exists under the federal criminal statutory counterpart of section 1983, 18 U.S.C. § 242. Under this statute, a public defender may be criminally charged for willful conduct which results in a deprivation of a right protected under the Fourteenth Amendment. In this Circuit, a public defender may be indicted for willfully depriving a defendant of his Sixth Amendment rights. *United States v. Senak*, 477 F.2d 304 (7th Cir. 1973), *cert. denied*, 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105. Although it is the public defender who may be charged, the real harm which is protected by the existence of this cause of action is the "subjection of an indigent to

deprivation of his Sixth Amendment rights." *Senak, supra* at 309. (Fairchild, J., concurring). Finally, the defendant would arguably have the same state action in tort for malpractice against the public defender as a former client might have against a retained attorney.

In view of the importance of public policy considerations stressed by the Supreme Court in *Imbler*, it is unnecessary to draw parallels between the role of a public prosecutor or a state executive official and a public defender. An inquiry into the policy considerations affecting the question of extending absolute immunity to a public defender demonstrates the uniqueness of that position. The policy considerations found by this Court to exist when *John* was decided are still valid. By using the *Imbler* analysis, such considerations form the basis of a finding that absolute immunity should exist. Policy considerations raised herein and by the *Miller* and *Minns* courts support a holding that a public defender should be absolutely immune from liability from suits brought under section 1983 of the Civil Rights Act for acts done in the performance of his quasi-judicial function as a public defender.

The final part of this analysis requires that we determine whether the acts complained of were conducted within the scope of Bergstrom's duties as a public defender. The complaint alleges only that the delay involved caused certain injury to Robinson. There is no allegation that the delay was intentional. In fact, Bergstrom testified that the delay was due to an error in his judgment with regard to his caseload.

Although the delay involved here cannot be condoned, such an action was conducted within the scope of the representation of Robinson as a public defender. As such, under the reasoning set forth in the foregoing discussion, the defendant is immune from the section 1983 claim. Despite the fact that the district court dismissed the action on state action grounds, we affirm the dismissal on the basis of absolute immunity.[13]

13. This Court may, of course, affirm on grounds other than those stated by the district court. *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491.