Michael Eugene GIBSON, Individually and as Special Administrator of the Estate of Eugene Gibson, deceased, Plaintiff,

v.

The CITY OF CHICAGO, James O'Grady, Dennis Gray and J. Morowally, Defendants.

No. 87 C 3482.

United States District Court,
N.D. Illinois, E.D.

Dec. 15, 1988.

Daniel E. Radakovich, Daniel T. Coyne, Alan M. Freedman, Bruce H. Bornstein, Chicago, Ill., for plaintiff.

James P. McCarthy, Terence J. Moran, Asst. Corp. Counsels, City of Chicago, General Litigation, Dept. of Law, Arthur Mooradian, Allan Ackerman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Three months after being placed on the Chicago Police Department's medical roll due to mental unfitness, Officer Arthur Novit shot and killed Eugene Gibson. Michael Eugene Gibson, individually and as special administrator of the decedent's estate, filed a two-count complaint against Novit, the City of Chicago, Cook County Sheriff James O'Grady, and two Chicago police officers, Dennis Gray and J. Marowally, contending that the shooting violated Gibson's constitutional rights and the Illinois Wrongful Death Statute. All of the parties except Novit have moved for summary judgment.

### I

After several departmental complaints had been lodged against Novit alleging that he used excessive force in performing his duties as a Chicago police officer, the Chicago Police Department ("Department") ordered that he undergo psychological evaluation. On 11 January 1983 he did so; and it revealed that he was suffering from atypical impulse control disorder, a condition which frequently left him unable to resist the temptation to use force—even excessive force—while carrying out his duties. *See DSM–III–R: Diagnostic and Statistical Manual of Mental Disorders* 321–22, 328 (3d ed. rev.1987).

Based on this diagnosis, on March 3 the Department placed him on the medical roll as being mentally unfit for duty; he continued to draw full salary and benefits. In a written order the Department enjoined him from carrying a gun or other deadly weapon, and from "exercising the power of arrest or any other police power." The order also directed him to surrender his Shield, Star, and identification card; and he did so. Although the order contained a signature line for Novit's acknowledgment, he refused to sign. Two other officers (Phillip Chamiak and Dale Marino), however, signed as witnesses. The Department made no attempt to recover Novit's gun (his personal property) or the ammunition it had issued to him; nor did it discipline him for refusing to sign the acknowledgment.

At about 1 a.m. on June 19, Novit saw Gibson in the vicinity of 4115 North Hermitage, Chicago, Illinois. For reasons not spelled out by any of the parties, Novit approached Gibson, identified himself as a Chicago police officer, drew his gun and informed Gibson that he was under arrest. Novit, once again for reasons left unexpressed, then shot Gibson in the chest, killing him.

Following the shooting, the police scoured the area and eventually found a closed pocketknife (apparently related to the shooting); but Gibson's fingerprints were not on it. Officer Marowally filed a report concluding that Novit was assaulted by Gibson and shot him in self defense. Officer Antczak filed a supplementary report reaching the same conclusion. But, after an investigation, the Office of Professional Standards determined that Novit shot Gibson without justification, and that he violated Department Rules 6 and 39 (now codified as Rules 3 and 30).[1]

1. Rule 6 prohibits a police officer from disobeying "a lawful order or directive"; Rule 39 requires a police officer to make oral and written reports whenever he discharges a firearm. No-

On June 22 O'Grady suspended Novit for violating Department Rules; he also filed charges with the Chicago Police Board seeking Novit's removal or other punishment. At the end of the suspension period, however, Novit resigned and O'Grady requested that the charges against him be withdrawn; they were. Novit was not charged with a criminal offense (at least as of this date).

The plaintiff alleges that Novit was acting under color of State law when he shot Gibson; hence the sec. 1983 action. He also claims that Marowally, Gray and Antczak filed false reports in a concerted effort to cover up Novit's blunder.

The allegations against the City and O'Grady are a bit more involved. According to the complaint, the City and O'Grady are liable because they took no action to recover Department-issued ammunition from Novit, and because they failed to inform the "proper authorities" (such as the State agency which issues licenses to carry firearms) that Novit had been placed on the medical roll as mentally unfit for duty. The plaintiff also claims that the City and O'Grady have failed to promulgate adequate policies "regarding the retention of firearms by police officers who have been placed on the medical roll due to [mental] unfitness"; and that the Department lacks adequate procedures to confiscate the weapons of officers deemed mentally unfit for duty, and to train and supervise officers responsible for recovering Department property from officers on medical leave. Para. 41. These failed policies and procedures were adopted with "deliberate indifference indicating reckless disregard for the rights of [Gibson] and other citizens of the City of Chicago * * * by failing to protect them from police officers", such as

Novit, who are allowed to keep their weapons after being found mentally unfit for duty. Para. 42.

The City and O'Grady, the complaint continues, "knew or should have known" that these policies and procedures were inadequate; and finally, that the policies were the proximate cause of Gibson's death, thus violating his constitutional rights to be "secure in his person and free from punishment" without due process of law.[2]

## II

In order to recover under sec. 1983, a plaintiff must plead and prove four elements: he held a constitutionally protected interest; he was deprived of his interest in violation of the Constitution; the defendant caused the deprivation; and the defendant acted under color of state law. *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988). As we make clear below, we are convinced that the plaintiff has no sec. 1983 claim against any of the defendants.

## A

■ As we noted at the outset, three months after being ordered not to carry a gun or to exercise any police authority, and having surrendered his Star, Shield and identification card, Novit shot and killed Gibson while purporting to exercise police authority. Was he acting under color of State law within the meaning of sec. 1983? We do not think so.

The defendants' argument is straightforward: they concede that Novit was employed by the Department when he shot Gibson, but they argue that his employment status is not a sufficient condition to imbue his actions with the color of State law. Rather, they contend that the March

---

vit contravened the former by carrying a weapon in violation of the March 3 order, and the latter by failing to make any report after he shot Gibson.

**2.** The plaintiff's claim in essence is that Novit used excessive force in arresting Gibson. Excessive force in arrest claims, whether brought as violations of the fourth amendment's prohibition of unreasonable seizures or of the substantive guarantees contained in the Due Process Clause of the fourteenth amendment, are ana-

lyzed under the fourth amendment's objective reasonableness standard, not the lubricous standard involved in substantive due process. See *Lester v. City of Chicago*, 830 F.2d 706, 710, 713 (7th Cir.1987); *see also* Note, *Rethinking Excessive Force*, 1987 Duke L.J. 692 (1987) (concluding that all excessive force claims should be analyzed under the objective standards of the fourth amendment, and discussing *Lester* with approval).

order "stripped" Novit of his authority as a police officer; it follows, therefore, that Novit was not acting under color of State law when he shot Gibson three months later.

The plaintiff's response, as best as we can make it out, consists of three propositions: first, the City is being hypocritical because it would not claim that Novit was acting as a private party if he had shot a "fleeing felon" instead of an innocent bystander; second, Novit was able to kill Gibson only by virtue of his status as a police officer (which allowed him to carry the gun) and third, Novit's conduct falls within sec. 1983 because he was known throughout the neighborhood to be a police officer. It is to these arguments we now turn.

The plaintiff's first argument, that Novit's actions were under color of State law because the City is being hypocritical, requires little comment. The argument runs like this: if Novit's conduct had been justified, then the City would not have denied he was acting under color of State law; indeed it would have commended Novit; therefore, because the City would treat Novit as an authorized police officer if he had acted justifiably, it should be required to treat him similarly though he acted unjustifiably. First, speculation will not save the day for a party opposing a motion for summary judgment. And second, even if the plaintiff's conjecture were fact and the City had commended Novit for foiling a crime, it does not follow that Novit would have been acting under color of State law when he did so. Private citizens who perform heroic acts or foil crimes are commended by public officials all of the time, but it does not mean that their acts are taken under color of State law. See *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987); *Lee v. Town of Estes Park*, 820 F.2d 1112, 1115–16 (10th Cir.1987).

The plaintiff's second attempt to portray Novit's actions as being taken under color of State law revolves around Novit's status

as a police officer, which, the plaintiff contends, allowed Novit to carry the gun he used to kill Gibson. We find this statement puzzling. Under Illinois law, all citizens, not just police officers, are allowed "to keep and bear arms".[3] *See* Ill. Const. art. 1, sec. 22 (1970). (There are qualifications, *see* Ill.Ann.Stat. ch. 38, para. 83–8 (Smith–Hurd 1987), but they are not relevant here.)

Nevertheless, even if it was Novit's status as a police officer that allowed him to carry the gun, we do not believe that it would be sufficient to render his actions "under color of" State law. Followed to its logical conclusion, such a principle would mean that if Novit used his gun to commit murder or armed robbery it would constitute conduct under color of State law; and thus actions for which the State would bear responsibility. Needless to say, we are reluctant to embrace a principle that would engender such results; it would sever the "under color of" law requirement from its conceptual moorings and allow sec. 1983 to reach purely private conduct simply because the perpetrator is a public employee who happens to use public property to achieve his unlawful end. Section 1983 is intended to provide a remedy only to those injured by the abusive exercise of *governmental* power; the plaintiff's principle recognizes no such limit; and therefore we reject it. See *Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir.1982) (police officer who shot and killed his wife not acting under color of state law); *Rogers v. Fuller*, 410 F.Supp. 187, 191 (M.D.N.C.1976) (even assuming police officers stole $35,000 worth of plaintiffs' rare coins, they were not acting under color of state law).

The plaintiff's final argument centers on the doctrine of apparent authority, which is "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons", Restatement (Second) of Agency, sec. 8 (1958); it can be created by words or

---

**3.** It is true that a municipality such as the City could prohibit the possession of handguns, *see Quilici v. Village of Morton Grove*, 695 F.2d 261 (7th Cir.1982), but the plaintiff does not suggest that the City has done so.

"any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* at sec. 27. Apparent authority arises from the principal's manifestation to the third person rather than to the agent; the principal must be "responsible for the information which comes to the mind of the third person." *Id.* at comment a. And the third person must believe that the agent is in fact authorized to act on behalf of the principal. *Id.* at comment c.

Here the plaintiff points to the fact that Novit and Gibson were neighbors; that Gibson knew Novit was a Chicago police officer; and that the Department did nothing to dispel this belief even after it had Novit stripped of authority and placed him on the medical roll. According to the plaintiff, when Novit approached Gibson on the night of June 19, Gibson reasonably believed that Novit was a fully authorized police officer; and therefore that the doctrine of apparent authority applies (or that it at least creates a genuine issue of material fact which precludes the entry of summary judgment, see *Gizzi v. Texaco, Inc.,* 437 F.2d 308 (3d Cir.1971) (whether apparent authority exists is a question of fact for the jury)). If, as the plaintiff seems to argue, the doctrine of apparent authority applies in its full common law scope, then we would agree that summary judgment would be inappropriate. *Ib.*

We do not share the plaintiff's view, however. Our interpretation of sec. 1983 is guided by principles of statutory construction, not common law development. And there is a huge difference. The doctrine of apparent authority, like all of the rules concerning the liabilities of parties to the agency relationship, evolved for the advancement of the interests of the business community, which is almost wholly run by agents. *See* W. Seavey, *Handbook of the Law of Agency* sec. 2A (1964). In the contract realm the doctrine serves to protect the reasonable commercial expectations of those who rely on the principal's conduct vis-a-vis his ostensible agent. In the tort context it enables a plaintiff to subject an employer to liability vicariously by virtue of the principle of *respondeat superior,* which "is a rule of policy, a deliberate allocation of a risk." *Prosser and Keeton on Torts* sec. 69 (5th ed. 1984). Vicarious liability has little to do with fault; rather, it reflects the social policy that employers, rather than innocent plaintiffs, should bear the burden of the losses caused by their employees while acting in the scope of their employment; this policy itself rests on the premise that employers are best able to absorb and distribute these losses through prices and insurance.

While sec. 1983 is to be interpreted in light of common law tort principles, it does not incorporate those principles wholesale. For example, it does not incorporate the principle of vicarious liability, *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As we noted above, sec. 1983 was enacted to enforce the fourteenth amendment, which itself was adopted to prevent abuses of governmental authority. See *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Abuse of governmental authority requires the exercise of governmental power in fact. That Gibson believed—reasonably—that Novit was a fully authorized Chicago police officer is therefore insufficient to bring Novit's conduct within the meaning of sec. 1983. Governmental power must be the motivating force behind the alleged violation.

This leads us to the plaintiff's best argument: that the March 3 order did not "strip" Novit of his authority, it simply forbade him from exercising it; and that by shooting Gibson, Novit *misused* authority he possessed; and that under *Monroe,* the misuse of governmental power is still action under color of State law. While this is the plaintiff's best argument, it is nevertheless a loser. The Department ordered Novit not to exercise *any* police authority. For all intents and purposes Novit was dispossessed of all power: authority that cannot be translated into action is no authority at all. Lacking any authority to act

as a police officer, Novit was not acting "under color of" State law when he shot Gibson.

True, *Monroe* can be read broadly enough to encompass Novit's actions; after all, the police officers in *Monroe* were not "authorized" to conduct an improper search; but the misuse of authority is still the exercise of authority. They were authorized to conduct a search; and the fact they did so in an impermissible manner did not serve to deprive their acts of state authority. See *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945) ("Acts of officers who undertake to perform their official duties are ['under color of' State law] whether they hew to the line of their authority or overstep it."). Here, however, Novit was not authorized to use any police authority; he could not misuse power he could not exercise in the first place. Only where the "initial power" flows from the state can a public official's conduct be imbued with the color of law, *Kedra v. City of Philadelphia*, 454 F.Supp. 652, 665 (E.D.Pa.1978). And where, as in this case, a public official is prohibited from acting in his public capacity entirely, there is no "initial power" generated by the state; and therefore no action "under color of state law."[4] Accordingly, the plaintiff has no sec. 1983 claim against Novit.[5]

### B

Since Novit's actions were not taken under color of State law, it follows that the plaintiff's decedent has no excessive force claim against the City or O'Grady. *Lester*

*v. City of Chicago*, 830 F.2d 706, 710, 713 (7th Cir.1987), held that all excessive force in arrest claims are to be analyzed under the fourth amendment. The fourth amendment prohibits unreasonable seizures; but because Novit's conduct was not that of a State actor, Gibson was never seized within the meaning of the fourth amendment, *Archie v. City of Racine*, 847 F.2d 1211, 1215 (7th Cir.1988) (*en banc*).[6]

This much said, it is still possible for the plaintiff to recover against the City and O'Grady directly under the Due Process Clause of the fourteenth amendment. That is, the plaintiff can prevail if the City or O'Grady deprived Gibson of his life without due process of law. After careful consideration, however, we are persuaded that he cannot do so.

The Federal Constitution does not duplicate duties of care in the common law of torts. It is a political charter that distributes power. It allocates power vertically between the federal and state governments, and horizontally among the different branches of the federal government. But power carries with it the potential for abuse; hence, the Bill of Rights enjoins government from acting in certain spheres.

▪ The Framers were concerned about affirmative abuses of power, not that government might be impuissant. *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir.1983); *see also The Federalist* No. 51 (Madison). Accordingly, the Due Process Clause does not protect against negligent acts that deprive a person of life, liberty, or property, *Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662

---

**4.** This distinction, in our view, explains the contrary result in *Monroe*, where the officers who engaged in the improper search were authorized to act initially. See also *Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6, 11 (W.D.Pa. 1981) (city council president who accepted bribes acted "under color of" State law even though he had no authority to do so).

Put another way, we believe Novit's status after March 3 was more analogous to that of a suspended officer than to an officer who was off duty but still authorized to exercise his authority.

**5.** Section 1983's "color of" state law requirement is, at least in the Seventh Circuit, jurisdictional,

*Robinson v. Bergstrom*, 579 F.2d 401, 404 (7th Cir.1978). But see *Carter v. Norfolk Community Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir.1985) (color of State law not jurisdictional).

**6.** *Archie* also precludes recovery under the "shocks-the-conscience" approach of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), because it is too indeterminate to notify public officials of the rules they must follow, *see* L. Fuller, *The Morality of Law* 63–65 (Rev. ed. 1969), and invites speculation into subjective intent rather than on objective circumstances. *Archie*, 847 F.2d at 1215. *See supra* n. 2.

(1986); nor even against acts of gross negligence. *Archie*, 847 F.2d at 1219–20. Rather, it extends only to reckless and intentional governmental action.[7] Therefore, in order for the plaintiff to recover, he must establish that the remaining defendants recklessly or intentionally deprived Gibson of a constitutionally protected interest.

■ In this case, the City and O'Grady may have been negligent by failing to recover Novit's Department-issued ammunition or by failing to notify the "proper authorities" that Novit was unfit to carry a gun. But they were not reckless. As a matter of law, then, neither the City nor O'Grady owed Gibson a constitutional duty.

Our analysis is not yet concluded, however. The constitutional duty urged by the plaintiff might be the "duty to protect." The problem with this approach is that the Constitution does not obligate the states to provide even rudimentary services such as law enforcement. *Bowers v. De Vito*, 686 F.2d 616, 618 (7th Cir.1982), held that a State has no constitutional duty to protect its citizens from a "dangerous madman", reasoning that the Constitution is a charter of negative, as opposed to positive, liberties.[8] This reasoning has been echoed on a host of other occasions. See *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir. 1988) (*en banc*) (State not constitutionally

obligated to provide rescue services); *De Shaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298 (7th Cir.1987) (State has no duty to protect its citizens from private violence or accidents); *cert. granted*, —— U.S. ——, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988); *Walker v. Rowe*, 791 F.2d 507 (7th Cir.) (no constitutional duty to provide State employees with safe jobs), *cert. denied*, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986); *Jackson v. Byrne*, 738 F.2d 1443 (7th Cir.1984) (no constitutional duty to provide fire protection); *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983) (no constitutional duty to rescue). There is no constitutional duty to protect a citizen from private predation, and without such an obligation the plaintiff's sec. 1983 claim collapses. It could be argued, however, that the City's constitutional duty arises from its "special relationship" with Gibson. A "special relationship" arises in two situations: when the state places a person in a position of danger or when it deprives him of the means by which to secure help from private sources. See *Archie*, 847 F.2d at 1222–23. In this case it cannot reasonably be maintained that the City or O'Grady placed Gibson in danger[9] or stripped away alternative sources of relief: no special relationship existed, and therefore neither did a constitutional duty[10].

7. *See Archie*, 847 F.2d at 1220: "'Recklessness' is a proxy for intent; 'gross negligence' is not. To say that conduct is not reckless is to say that there is no basis for finding abuse of government power. An error is still an error, 'gross' or not; 'due process' does not mean 'due care'; since *Daniels* and *Davidson* held that errors are not unconstitutional, it follows that 'gross negligence' is not a sufficient basis of liability." *See also Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986).

8. For a contrary view, *see* Charles L. Black, Jr., *Further Reflections on the Constitutional Justice of Livelihood*, 86 Colum.L.Rev. 1103, 1104 (1986) (arguing that the ninth amendment serves as a "command[ ] * * * to use the methods available within our legal system in an ongoing *search* for 'unenumerated' rights, [such as the right to a 'decent material basis for life'], with a view to their taking their place, without denial or disparagement, in a rational and therefore productive system,") (emphasis in original). This view, it seems to us, simply cannot be reconciled with the words and history

of the ninth amendment, *see generally* Office of Legal Policy, *Wrong Turns on the Road to Judicial Activism: The Ninth Amendment and Privileges or Immunities Clause* 8–27 (1987), or with the proper role of the federal courts in a system of representative government. *See Griswold v. Connecticut*, 381 U.S. 479, 520 (1965) (Black, J., dissenting); Wolfe, *How the Constitution was Taken Out of Constitutional Law*, 10 Harv.J.L. & Pub.Pol'y 597, 613–15 (1987).

9. We are aware that one could argue that the City and O'Grady placed Gibson in peril by allowing Novit to remain "employed" as a police officer; but to adopt this reasoning would effectively require us to ignore the "no duty to protect" rule established in *Bowers* and its progeny.

10. Thus, although Illinois law recognizes a cause of action against an employer (such as the Department) who negligently retains an employee he knows or reasonably should know is unfit for the job and will create a risk of harm to third persons, *see Bates v. Doria*, 150 Ill.App.3d

### C

Even if the City owed Gibson a constitutional duty of care, the plaintiff still would be precluded from maintaining a sec. 1983 action against the City. In order to subject a municipality to liability under sec. 1983, a plaintiff must plead and prove the municipality is at fault for the deprivation. *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985) (plurality opinion). To this end, a plaintiff must plead and prove that a municipal policy or custom deprived him of a constitutionally protected right. Here, however, the plaintiff has not adduced evidence sufficient to allow a rational factfinder to conclude that the alleged Department policies were the motivating force behind Gibson's death.

The plaintiff finds fault in the following Department "policies":

(1) inadequate "policies regarding the retention of Firearms by police officers" who have been placed on the medical roll due to mental unfitness for duty;

(2) inadequate procedures to confiscate the weapons of officers deemed mentally unfit for duty; and

(3) inadequate procedures "to train and supervise police officers responsible for collecting D[epartment] issued equipment from officers" placed on the medical roll.

Each of the "policies" alleged by the plaintiff finds its roots in municipal inaction. Assuming a failure to act can constitute a "policy" within the meaning of sec. 1983, *see* Note, *Municipal Liability Under Section 1983: The Failure to Act As "Custom Or Policy",* 29 Wayne L.Rev. 1225 (1983), we also believe that such inaction must be the product of conscious decisionmaking, see *Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436, or of conduct which acquiesces in or tacitly authorizes unconstitutional conduct by subordinates.[11]

The existence of a municipal policy cannot be inferred from a single, isolated unconstitutional act of a subordinate "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, * * * which can be attributed to a municipal policymaker." *Tuttle,* 471 U.S. at 824, 105 S.Ct. at 2437. The policies here, however, are not themselves unconstitutional; and therefore the plaintiff must plead and prove more than a single incident of unconstitutional conduct. See also *Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985).

Here, arguably, the plaintiff has not alleged facts from which it reasonably can be inferred that these policies actually exist. The only alleged failures identified by the plaintiff are those relating to Gibson's death: a single, isolated act. Thus, a strong case can be made that the plaintiff has not adequately alleged the existence of a municipal policy.

But even if he has, he has not satisfied the additional requirement that the policy be one "that could have caused his injury." *Strauss,* 760 F.2d at 769. Section 1983 imposes liability on persons acting "under color of" law who "subject or cause to be subjected" another person to the deprivation of his federally protected rights. *See* S. Nahmod, *Civil Rights and Civil Liberties Litigation* Sec. 3.18 (2d ed. 1986). Thus, as we noted above, in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed. 2d 611 (1978), the Court held that municipal liability can be imposed only where the municipality itself "causes" the constitutional deprivation because Congress did not intend to hold municipalities vicariously liable for the unconstitutional conduct of its employees. The requirement of a direct causal connection between municipal conduct and the constitutional deprivation has led to an additional requirement in sec. 1983 actions involving policies of municipal inaction: a heightened state of mind re-

---

1025, 104 Ill.Dec. 191, 502 N.E.2d 454 (2d Dist. 1986); *see also* Silver, *Police Civil Liability* sec. 9.14 (1988), the existence of a state law duty does not create a corresponding constitutional duty. *Archie,* 847 F.2d at 1215–18.

**11.** We have recently addressed the issue of municipal liability at some length in *Ross v. United States,* 697 F.Supp. 974 (N.D.Ill.1988).

quirement. Since municipal policies of omission are remotely, if at all, connected causally to individual affirmative misconduct, a heightened state of mind requirement is necessary to trace the unconstitutional conduct to the municipality.[12] Absent this requirement, remote casual nexuses would suffice, and *Monell*'s rejection of vicarious liability would for all practical purposes be discarded. See *City of Springfield v. Kibbe*, 480 U.S. 257, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting from the dismissal of *certiorari*). Thus, municipal liability for injuries resulting from policies of inaction must be supported by allegations and proof of an "extremely high degree" of municipal culpability. *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir.1986); *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir.1983); *see also Kibbe*, 107 S.Ct. at 1121 (O'Connor, J., dissenting from the dismissal of *certiorari*) (municipal liability for police of inadequate training may result in sec. 1983 liability "only where the failure to train amounts to a reckless disregard for or deliberate indifference to the rights of persons within the city's domain"). Additionally, where, as in this case, the policy itself is not unconstitutional, there must be evidence of a course of events that allows an inference of deliberate indifference or tacit authorization of unconstitutional conduct, *Jones*, 787 F.2d at 205. And such evidence is nowhere to be found in this case.

■ When it appeared that Novit was having trouble performing his duties without cudgeling those he arrested, the Department ordered him to undergo psychological evaluation; and when he was diagnosed as mentally unfit for duty, the Department promptly placed him on medical leave, ordered him not to carry a deadly weapon or to exercise any power he possessed by virtue of being a police officer, and to surrender his Star, Shield and identification card. Hardly conduct which suggests deliberate indifference to or tacit authorization of Novit's actions. True, the Department did not confiscate his weapon (assuming it could) or his ammunition. But these failures do not rise to the level of deliberate indifference to or reckless disregard for the rights of those within the City's domain. An act is reckless in the constitutional sense "when it reflects complete indifference to risk—when the actor does not care whether the person lives or dies, despite knowing there is a significant risk of death." *Archie*, 847 F.2d at 1219. Deliberate indifference is its equivalent. See *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Nor do they allow the inference that the City "tacitly authorized" the unconstitutional conduct. Tacit authorization, like recklessness, requires an awareness of the conduct being sanctioned. There is simply no plausible factual basis for reaching this conclusion here. As we made clear in our discussion of duty, at most the City was negligent; and negligence—gross or otherwise—is insufficient to satisfy the causation element of sec. 1983 in actions against municipalities for injuries resulting from policies of inaction.

### D

■ Since neither Novit nor any other subordinate committed a constitutional violation, it necessarily follows that O'Grady

12. The heightened cognitive requirement may appear to be at loggerheads with the Court's recognition that sec. 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right. *Daniels v. Williams*, 474 U.S. 327, 329–30, 106 S.Ct. 662, 664–65, 88 L.Ed. 2d 662 (1986); *Parratt v. Taylor*, 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). Although this cognitive element derives from sec. 1983, it does so as the concomitant of the statute's direct causation requirement. It is subordinate to and dependent upon the element of causation: no heightened state of mind, no direct causation; no direct causation, no sec. 1983 liability. If, however, the state of mind requirement is abandoned in claims founded on municipal policies of inaction, it would result in municipal liability under the doctrine of *respondeat superior*, an outcome squarely at odds with *Monell*. We therefore do not find these positions on sec. 1983's intent requirement inconsistent. *But see* Note, *Municipal Liability for Police Misconduct: Must Victims Now Prove Intent?* 97 Yale L.J. 448 (1988).

is not liable for his actions as supervisor: such liability, which requires a supervisor to participate personally in the unconstitutional conduct of a subordinate, is derivative. See *Murphy v. Chicago Transit Authority,* 638 F.Supp. 464 (N.D.Ill.1986). Unless a subordinate violates the Constitution, there can be no supervisor liability. S. Nahmod, *Civil Rights and Civil Liberties* Sec. 3.16 (1986) (supervisor liability depends on the commission of a constitutional violation by a subordinate). Nevertheless, even if Novit had been acting under color of State law, judgment still would be entered in O'Grady's favor. Because sec. 1983 requires personal involvement, a plaintiff must allege that that each defendant is responsible for depriving him of his constitutional rights in a constitutional sense. *Patton v. Przybylski,* 822 F.2d 697, 701 (7th Cir.1987). This means that in cases involving allegations of inaction the supervisor's conduct must be attended by the same heightened state of mind requirement needed in the municipal liability context. The allegations against O'Grady are identical to those against the City with the exception of the claim that O'Grady requested the charges filed against Novit after the shooting be withdrawn in order to prevent further investigation and criminal charges. This additional allegation does not save the plaintiff's complaint against O'Grady. It does not show that O'Grady was aware of actual constitutional deprivations or that there was such a strong likelihood of imminent deprivations that any reasonable person would have taken preventative measures. *Jones,* 787 F.2d at 205; *Thomas v. City of Zion,* 665 F.Supp. 642, 647 (N.D.Ill.1987).

### E

Finally, the plaintiff seeks to hold Officers Morowally and Gray liable for conspiring to deprive Gibson of his constitutional rights in violation of sec. 1983. This claim cannot stand, however, because conspiracy requires an actual deprivation of the plaintiff's constitutional rights. *Hampton v. Hanrahan,* 600 F.2d 600, 622 (7th Cir. 1979), *aff'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (*per curiam*). As we have made clear, no deprivation of Gibson's constitutional rights has occurred; thus, he has no sec. 1983 conspiracy claim.

### III

Gibson's death at Novit's hands is tragic. But it is not the function of the Constitution to set right all tragedies, only those which are the result of intentional or reckless governmental misconduct. The plaintiff has no constitutional claim against any of the defendants. Accordingly, the plaintiff's sec. 1983 claim against Novit is dismissed for want of subject matter jurisdiction; judgment is entered in favor of all remaining defendants on Count I. The plaintiff's cross-motion for summary judgment is denied; and Count II, a pendent State law claim, is dismissed for want of subject matter jurisdiction. See *Argento v. Village of Melrose Park,* 838 F.2d 1483, 1491 (7th Cir.1988).