Michael Eugene GIBSON, Individually and as Special Administrator of the Estate of Eugene Gibson, Deceased, Plaintiff-Appellant,

v.

The CITY OF CHICAGO, a Municipal Corporation; Arthur Novit, Individually and in his Official Capacity as a former Chicago Police Officer; James O'Grady, Individually and in his Official Capacity as the Former Acting Superintendent of the Chicago Police Department; J. Marowally, Star # 4881, Individually and in his Official Capacity as a Chicago Police Officer; and Dennis Gray, Star # 13605, Individually and in his Official Capacity as a Chicago Police Officer, Defendants-Appellees.

Nos. 88-3488, 89-1115.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1990.

Decided Aug. 23, 1990.

Daniel Radakovich, Daniel T. Coyne, Alan M. Freedman, Bruce H. Bornstein, Freedman & Bornstein, Chicago, Ill., for plaintiff-appellant.

James P. McCarthy, Corp. Counsel, Office of the Corp. Counsel, Allan A. Ackerman, Judson H. Miner, Ruth M. Moscovitch, Nina Puglia, Asst. Corp. Counsel, Terence J. Moran, Office of the Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Plaintiff-appellant Michael Eugene Gibson, on behalf of the decedent, Eugene Gibson, brought suit under 42 U.S.C. § 1983 against the City of Chicago and several members of the Chicago Police Department. The decedent was shot and killed by Officer Arthur Novit shortly after Novit had been placed on the Department's medical roll as mentally unfit for duty. Mr. Gibson appeals a grant of summary judgment in favor of the City of Chicago, the Acting Superintendent of Police, and certain Chicago police officers. He also appeals the dismissal of his claim against Officer Novit and the dismissal of his pendent state law wrongful death claim. For the following reasons, we affirm the dismissal of the section 1983 claim against Novit and the grants of summary judgment for Acting Superintendent O'Grady and Officers Marowally and Gray on the cover-up claim. However, we reverse as premature the grants of summary judgment in favor of the City and O'Grady in his official capacity on the municipal liability claim, and reverse the grant of summary judgment in favor of O'Grady in his individual capacity on the supervisory liability claim.

## I

## BACKGROUND

### A. *Facts*

Between 1980 and the end of 1982, Chicago police officer Arthur Novit was the subject of several public complaints alleging that he had used excessive force in the performance of his duties. In response to these complaints, the Chicago Police Department ordered Officer Novit to undergo a psychological evaluation. The evaluation revealed that Novit suffered from atypical impulse control disorder, a condition that frequently drove Novit to use excessive force when carrying out his police duties. On March 3, 1983, in response to this diagnosis, the Department placed Novit on the medical roll (i.e., medical leave status) and declared him mentally unfit for duty. While on the medical roll, Novit continued to receive his full salary and benefits. The Department also issued Novit a written order that prohibited him from carrying his gun or any other deadly weapon and directed him not to "exercise the power of arrest or any other police power."[1] The order also commanded Novit to turn in his shield, star, and police identification card. Below the terms of the order was a signature line for Novit's acknowledgment. Although Novit refused to sign the acknowledgment,[2] two other officers signed the signature blanks provided for witnesses.

Although Officer Novit did surrender his star, shield, and identification card, the Department made no attempt to recover Novit's service revolver or the ammunition it had issued to him.[3] The Department also took no disciplinary action against Novit for his failure to sign the acknowledgment

1. The order issued to Officer Novit stated in pertinent part:

   By the authority vested in me, by the Superintendent of Police, you are hereby directed and expressly ordered by me, Captain Joseph P. Beazley, Director of the Personnel Division, effective 8 March 1983, as follows:
   1) You are not to carry a firearm or any other deadly weapon.
   2) You are not to exercise the power of arrest or any other police power bestowed upon you by virtue of your employment, as a sworn member of the Chicago Police Department.
   3) You are to surrender your Chicago Police Star, Shield, and identification card as directed.
   This order will continue in full force and effect until further notice.

   Violation of this order will subject you to disciplinary action and may be used as the basis to bring charges seeking separation from the Department.
   R.35 at Ex. A.

2. On the executed version of the order, the line provided for Officer Novit's signature read, in handwritten form, as follows: "Refused 8 March 1983."

3. The district court opinion indicates that Officer Novit personally owned the gun that he used as his service weapon. *Gibson v. City of Chicago*, 701 F.Supp. 666, 667 (N.D.Ill.1988). After the shooting, however, the Police Department seized and subsequently destroyed the gun. *See* R.39, Plaintiff's 12(e) Statement at 2, ¶ 8; R.41, City of Chicago's Local Rule 12(f) Statement at 2, ¶ 2.

on the order. On June 19, 1983, approximately three months after being placed on the medical roll, Officer Novit encountered Eugene Gibson in the neighborhood where both men lived.[4] For reasons unexplained on the record, Novit identified himself as a police officer, drew his gun, informed Gibson that he was under arrest, and then fatally shot Gibson in the chest.

The initial police reports of the incident, prepared by Officers Marowally and Gray, concluded that Novit had been the victim of an aggravated assault and that his shooting of Gibson was, therefore, a justifiable homicide. However, a subsequent investigation by the Office of Professional Standards (OPS), determined that Novit shot Gibson without justification and violated two Department rules: one that prohibits an officer from disobeying a "lawful order or directive," and another that "requires a police officer to make oral and written reports whenever he discharges a firearm." *Gibson v. City of Chicago*, 701 F.Supp. 666, 667 & n. 1 (N.D.Ill.1988).

On June 22, 1983, Acting Superintendent of Police James O'Grady suspended Novit for thirty days for violation of Department rules and filed charges with the Chicago Police Board seeking Novit's discharge. Novit, however, tendered his resignation from the police force. In response to Novit's resignation, O'Grady had the departmental charges dropped. As of the time of the filing of the district court opinion, Novit had not been charged criminally in the matter.

## B. *Procedural Posture*

### 1. The section 1983 action

Michael Eugene Gibson, individually and as special administrator for the estate of his father, Eugene Gibson, brought suit under 42 U.S.C. § 1983 against the City of Chicago, Officers Novit, Marowally, Gray, and Acting Superintendent O'Grady.[5] The complaint alleged that Novit, acting in his capacity as a police officer and under color of state law, shot and killed Eugene Gibson without probable cause and deprived Gibson of his constitutional rights, including the right to due process of law. R.1 at 8, ¶ 46. The complaint further alleged that defendants Marowally and Gray filed false police reports in an effort to cover up Novit's misconduct, and that defendant O'Grady also took action to cover up Novit's misconduct. R.1 at 6, ¶¶ 32, 33, and 37. Finally, the complaint asserted that Acting Superintendent O'Grady and the City of Chicago had failed to promulgate adequate procedures to deal with the recovery of firearms and ammunition issued to police officers who had been placed on medical leave due to mental unfitness. R.1 at ¶¶ 40–41. These inadequate procedures, according to the complaint, constituted "deliberate indifference indicating reckless disregard" for the rights of the decedent and the other citizens of Chicago. R.1 at 7–8, ¶ 42. Gibson also asserted a pendent state wrongful death claim against Novit.

### 2. District court disposition

#### a. *motion to dismiss*

Defendants O'Grady, Marowally, Gray, and the City moved under Fed.R.Civ.P. 12(b)(6) to dismiss the section 1983 complaint for failure to state a claim. In denying the motion to dismiss, the district court stated that

> [t]he motion to dismiss turns, primarily, on the City defendants' contention that Novit's actions on the night in question were not "under color of state law" as that phrase is used in 42 U.S.C. § 1983. In support of this argument, they assert that, in connection with his medical leave status, Novit was expressly barred from carrying a firearm or exercising the power of arrest. They also claim he was

---

**4.** According to the record, Gibson and Novit were neighbors and, prior to the fatal encounter, Gibson knew that Novit was a police officer. *Gibson*, 701 F.Supp. at 670.

**5.** All of the individual defendants were sued in both their individual and official capacities. Another Officer, H. Antczak, also was sued

based on his role in allegedly preparing a police report that concluded that the shooting was a justifiable homicide. Officer Antczak died prior to the filing of the defendants' motion to dismiss, and his estate never was substituted as a party to the action.

required to surrender his badge and police identification card. Novit's service revolver, they observe, was the personal property of the officer and not subject to department control.

These claims all go beyond the facts stated in the complaint. Thus, while the court believes the City defendants may have a good defense should these facts prove to be true, it must nevertheless deny the motion to dismiss. The arguments may be raised again in the form of a summary judgment motion after the parties have had the opportunity to conduct discovery on the issue.

R.28 at 2.

Subsequent to its denial of the defendants' motion to dismiss, the district court limited discovery to the color of law issue. R.29; R.41 at 2. The case later was transferred to a different judge, and the parties were given time to conduct discovery on the color of law issue. After the close of discovery, both the plaintiff and all defendants except Officer Novit moved for summary judgment.[6]

### b. *dismissal of Novit on the color of law issue*

In evaluating the other defendants' motion for summary judgment, the district court first considered whether Novit acted under color of state law when he shot Gibson. Although the defendants conceded that Novit was an employee of the Chicago Police Department when he shot Gibson, the district court concluded that Novit did not act under color of law because the Department's March 3 order divested him of all power and authority to act as a police officer. 701 F.Supp. at 670–71. Thus, reasoned the court, Novit

possessed no police authority to misuse, and therefore was not acting as a policeman when he shot Gibson:

> The Department ordered Novit not to exercise *any* police authority. For all intents and purposes Novit was dispossessed of all power: authority that cannot be translated into action is no authority at all. Lacking any authority to act as a police officer, Novit was not acting "under color of" State law when he shot Gibson.

*Id.* at 670–71 (emphasis in original). Because the district court concluded that Novit had not acted under color of state law, and because action under color of state law is a jurisdictional prerequisite to a section 1983 claim, *see Robinson v. Bergstrom*, 579 F.2d 401, 404 (7th Cir.1978), *overruled on other grounds, Polk County v. Dodson*, 454 U.S. 312, 321, 102 S.Ct. 445, 451, 70 L.Ed.2d 509 (1981), the district court dismissed Gibson's claim against Novit for lack of subject matter jurisdiction.

### c. *summary judgment for the City on the municipal liability claim*

Having concluded that Officer Novit did not act under color of law when he shot and killed Gibson, the district court turned to the City's motion for summary judgment on the municipal liability claim. As a threshold matter, Mr. Gibson objected to the consideration of summary judgment on any ground other than the color of law issue. Because the court, after denying the defendants' motion to dismiss, had limited discovery to the color of law issue,[7] Gibson contended that a grant of summary judgment on any other issue would be tantamount to granting a motion to dismiss—a

6. Officer Novit's role in this litigation has been somewhat anomalous. His posture in the litigation is attributable largely to the antagonism between himself and the City, his co-defendant and former employer. Mr. Novit's counsel explained at oral argument that the City declined to represent him in the federal suit. Thus, before the district court, Novit opposed the City's motion to dismiss, contended that he did act under color of state law (he also purported to admit in his answer that he was acting under color of state law), and refused to join the other defendants in moving for summary judgment.

As will be explained below, the district court eventually dismissed Mr. Gibson's claim against Novit on the ground that Novit was not acting under color of state law. On appeal, Novit now urges that the district court reached the correct decision.

7. The imposition of the discovery stay took place before the case was transferred to the judge who considered the summary judgment motion.

motion that already had been denied.[8] The district court made no mention of the discovery stay issue in its discussion of the municipal liability and the other remaining claims.

With regard to the municipal liability claim, the court first concluded that Mr. Gibson had no excessive force claim against the City because excessive force claims are analyzed under fourth amendment principles and, since Novit was not acting under color of state law, Gibson was never "seized" within the meaning of the fourth amendment. *Gibson*, 701 F.Supp. at 671. As for any substantive due process claim against the City for deprivation of life, the court concluded that, while the City may have been negligent in failing to recover Novit's gun and ammunition or to notify the "proper authorities," the due process clause does not afford relief for even gross governmental negligence, but only for reckless or intentional deprivations. *Id.* at 671–72. The court also considered and rejected the possibility that the City had a constitutional "duty to protect" the decedent, or that a "special relationship" between the City and the decedent existed so as to impose such a duty. *Id.* at 672.

Alternatively, the district court held that even if the City owed the decedent some duty of care, Mr. Gibson's section 1983 claim against the City was precluded because of a failure to "adduce[ ] evidence sufficient to allow a rational factfinder to conclude that the alleged Department policies were the motivating force behind Gibson's death." *Id.* at 673. The court further stated that, even assuming the inaction alleged by the plaintiff could be considered a "policy," such inaction must be the product of conscious decisionmaking or conduct that tacitly authorizes unconstitu-

tional conduct by subordinates in order to subject the City to liability. *Id.* Additionally, the court noted, such a policy cannot be inferred from a single, isolated incident without proof that the incident was caused by an existing, unconstitutional policy. *Id.*

Finally, even assuming that the plaintiff alleged the existence of a municipal policy, the court noted that the plaintiff had failed to satisfy the additional prerequisites to liability in cases of municipal inaction: a direct causal link between the municipal conduct and the injury, as evidenced by proof of an " 'extremely high degree' of municipal culpability." *Id.* at 674 (quoting *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir.1986); *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983)). For these reasons, the district court concluded that the City's motion for summary judgment should be granted.[9]

### d. *summary judgment for O'Grady on the supervisory liability claim*

The district court also granted summary judgment to Acting Superintendent O'Grady in his individual capacity on the supervisory liability claim. The district court concluded that, because supervisory liability is derivative, and because neither Novit nor any other subordinate had deprived Gibson of his constitutional rights, supervisory liability could not be imposed on Acting Superintendent O'Grady. *Id.* at 674–75. Moreover, the district court concluded that, even if Novit had been acting under color of law, Mr. Gibson failed to make the required showing that O'Grady was involved personally in the alleged deprivation. Because Mr. Gibson had alleged that O'Grady's inaction was the cause of the alleged

---

**8.** *See* R.39, Plaintiff's Memorandum in Support of His Motion for Summary Judgment, and in Opposition to Defendant City's Motion for Summary Judgment, at 1–2. The defendants also acknowledge that discovery indeed was limited to the color of law issue. *See* R.41 at 2.

**9.** The district court's conclusion that summary judgment was appropriate on the municipal liability claim compels the conclusion that the district court also deemed summary judgment

appropriate on the official capacity claim against O'Grady. *See Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir.1987); *Archie v. City of Racine*, 826 F.2d 480, 486 n. 4 (7th Cir.), *opinion vacated and reh'g granted on other grounds*, 831 F.2d 152 (7th Cir.1987), *district court aff'd en banc*, 847 F.2d 1211 (7th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

constitutional deprivation, he had to show the same high degree of culpability as required in the municipal liability context. In this respect, the court explained, Mr. Gibson's claim against O'Grady was deficient. *Id.* at 675.

e. *summary judgment for Officers Marowally and Gray*

The district court also granted defendants Marowally and Gray summary judgment on the "cover-up" claim against them in their individual capacities. The court reasoned that the plaintiff was seeking to hold Officers Marowally and Gray liable for "conspiring to deprive Gibson of his constitutional rights in violation of sec. 1983," *id.* at 675, based on their filing of allegedly false police reports in order to cover up Officer Novit's misconduct. *Id.* The district court concluded that this claim could not stand because the plaintiff's case lacked a prerequisite to conspiracy liability

under section 1983—"an actual deprivation of the plaintiff's constitutional rights." *Id.*

## II

## ANALYSIS

A. *Dismissal of Novit on the Color of Law Issue*

■ Novit's mere status as a policeman does not render all of his acts under color of state law. "[A]cts committed by a police officer even while on duty and in uniform are not under color of state law unless they are in some way 'related to the performance of police duties.' " *Briscoe v. LaHue*, 663 F.2d 713, 721 n. 4 (7th Cir.1981) (quoting *Johnson v. Hackett*, 284 F.Supp. 933, 937 (E.D.Pa.1968)), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).[10] Likewise, a mere assertion that one is a state officer does not necessarily mean that one acts under color of state law. *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir.

10. *See, e.g., Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) ("Not every action by a state official or employee is to be deemed as occurring 'under color' of state law."), *cert. denied*, — U.S. —, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990); *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.1975) ("Acts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983"; " '[i]t is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law' ") (quoting *Johnson*, 284 F.Supp. at 937), *cert. dismissed as improvidently granted*, 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976); *Johnson*, 284 F.Supp. at 936–37 (acts committed by officers while on duty and in uniform are not under color of state law if they are wholly unrelated to the performance of police duties); *see also, e.g., Revene v. Charles County Comm'rs*, 882 F.2d 870, 872–73 (4th Cir.1989) (complaint stated claim that defendant deputy sheriff acted under color of law, even though the defendant was off-duty at time of shooting; local ordinance provided that officers were on duty 24 hours per day); *Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir.1982) (off-duty officer who shot wife and then killed himself was held not to have acted under color of law); *Traver v. Meshriy*, 627 F.2d 934, 937–38 (9th Cir.1980) (off-duty police officer, who was working as a "security teller" pursuant to the police department's secondary hiring program and whose primary duty in the event of a crime was to the department rather than the bank, was held to have acted under color of law when he detained a customer); *Robinson v. Davis*, 447 F.2d 753, 758–59 (4th Cir.1971) (part-time campus security officers who also were part-time town police were held not to have acted under color of law in requesting students to appear at college administrative hearing; it was clear that the officers were acting in their capacity as campus security officers), *cert. denied*, 405 U.S. 979, 92 S.Ct. 1204, 31 L.Ed.2d 254 (1972); *Watkins v. Oaklawn Jockey Club*, 183 F.2d 440, 442–43 (8th Cir.1950) (sheriff and deputy who were employed by a private racetrack were held not to have acted under color of law when they acted in their capacity as racetrack employees in ejecting a patron); *cf. West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (noting that if a defendant's conduct satisfies the state-action requirement of the fourteenth amendment, it is also action under color of state law for § 1983 purposes; noting further that "state employment is generally sufficient to render the defendant a state actor," *id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)), but seemingly qualifying this statement by adding that "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his *official capacity* or *while exercising his responsibilities* pursuant to state law," *id.* at 49–50, 108 S.Ct. at 2255–56 (emphasis supplied and citations omitted)).

1976).[11] Moreover, "whether or not a police officer is off-duty does not resolve the question of whether he or she acted under color of state law." *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir.1980); *see also Greco v. Guss*, 775 F.2d 161, 168–69 (7th Cir.1985) (collecting cases).

■ Thus, the essential inquiry becomes whether Mr. Gibson has created a triable issue of fact concerning whether Novit's actions related in some way to the performance of a police duty. *See Layne*, 627 F.2d at 13 (suggesting that the issue of whether a person acted under color of state law may present a jury question if there remain " 'unanswered questions of fact regarding the proper characterization of the actions' ") (quoting *Rowe v. Tennessee*, 609 F.2d 259, 265 (6th Cir.1979)). In this case, there are no dispositive facts in dispute. Instead, the question of whether Novit acted under color of law turns primarily on the legal effect of the March 3 order that directed Novit not to carry a weapon or exercise any police powers. If, as the defendants contend, the order "stripped" Novit of authority to perform any police duties, his act of shooting Gibson could not have been related to the performance of a police duty.

The defendants argue that, upon Novit's receipt of the March 3 order, his status became equivalent to that of a *suspended* officer who is stripped of all power to perform police duties. This position finds some support in *Bauer v. City of Chicago*, 137 Ill.App.3d 228, 91 Ill.Dec. 863, 484 N.E.2d 422 (1985), in which an officer temporarily suspended from the Chicago police force for disciplinary reasons was involved in a fatal shooting. The question before the court in *Bauer* was whether the City of Chicago could be held vicariously liable for the acts of the officer under *respondeat superior* (the court did not address the plaintiff's section 1983 claim because the plaintiff waived it on appeal). *Id.* 91 Ill. Dec. at 866–69, 484 N.E.2d at 425–28. Under Police Department regulations and general orders, a suspended officer receives no pay, is exempted from the general regulation that requires an officer to be on duty twenty-four hours a day for purposes of responding to emergencies, and is required not to carry a firearm while on suspension. *Id.* 91 Ill.Dec. at 866–67, 484 N.E.2d at 425–26. Given these restrictions, the court concluded that "suspension" meant that an officer's status was that of temporary withdrawal from employment, that a suspended officer was prohibited from engaging in police action, and that the suspended officer, therefore, could not have been acting within the scope of his employment even if he did engage in direct police action. *Id.*

**11.** In *Askew*, ten federal drug agents raided a home and conducted a search. Three of the federal agents also were employed by the St. Louis Police Department, and one of these three showed his St. Louis Police Department credentials rather than his Justice Department credentials in gaining entry to the home. 548 F.2d at 677. This court rejected the plaintiffs' argument that this "dual status" rendered the acts of the dual agents under color of state law. *Id.* The court noted that in all respects the raid was organized, instigated, and supervised by the federal agency. The court also noted that even the agent who flashed his state police credentials could not have been acting under color of state law because the house he was raiding was outside of his jurisdiction as a St. Louis police officer. *Id. But see Lopez v. Vanderwater*, 620 F.2d 1229, 1236–37 (7th Cir.) (improper prosecutorial acts taken by judge were held to be taken in excess of all jurisdiction so as to deny judge judicial immunity for these acts, but also were held to be acts taken under color of state law: "[the judge] was able to take his prosecutorial acts because he was cloaked with the office of judge. His use of that office to prosecute Lopez was action under color of state law," *id.* at 1237), *cert. dismissed*, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980); *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir.1979) (judge who acted in excess of his jurisdiction still was found to have acted under color of state law by "using the power and prestige of his office to damage the plaintiff"), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980); *United States ex rel Brzozowski v. Randall*, 281 F.Supp. 306, 311 (E.D.Pa.1968) (township policemen who went outside their jurisdiction to find plaintiff, identified themselves as township policemen, displayed or alluded to an arrest warrant, "arrested" plaintiff, and returned him to the township were held to have acted " 'under color of a policeman's badge,' " *id.* (quoting *Basista v. Weir*, 340 F.2d 74, 81 (3d Cir.1965)), and hence, under color of state law, notwithstanding the fact that they patently lacked actual authority outside their jurisdiction to make an arrest).

The *Bauer* court also concluded that the Police Department's general order that exempts a suspended officer from the general obligation to be on duty twenty-four hours a day strips the suspended officer of all power and authority to engage in direct police actions: "[a] suspended officer has only the same rights and obligations in preventing and stopping the commission of crime as any private citizen." *Id.* 91 Ill. Dec. at 867, 484 N.E.2d at 426. *See generally Spencer v. Lee*, 864 F.2d 1376, 1380 (7th Cir.1989) (en banc) (citizens' arrests are not under color of state law), *cert. denied,* —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). By contrast to the general order relied upon in *Bauer* to conclude that an officer was stripped of power, in this case we have a *specific* order issued to Novit not to exercise any police power. Thus, in some respects, the facts before us present a stronger case than in *Bauer* for concluding that the March 3 order stripped Novit of all power to perform police duties.

In support of his argument, the plaintiff cites *Davis v. Murphy*, 559 F.2d 1098 (7th Cir.1977), but we find this case distinguishable. In *Davis*, two off-duty police officers were held to have acted under color of state law when they initiated an altercation with five black citizens that culminated in the arrest of the citizens. The incident began when the off-duty officers shouted racial epithets at the citizens who were driving behind the officers. *Id.* at 1100. The situation escalated, and, when the off-duty officers exited their car, they identified themselves as police officers, carried their guns and badges, and effectively were on duty pursuant to Milwaukee Police Department regulations that officers were "to be always subject to duty." *Id.* at 1101. This court concluded, based on this evidence, that the officers were acting under color of law. *Id.*

Here, by contrast to the regulation in *Davis* that required officers always to be on duty, Officer Novit expressly had been ordered not to perform any police duties. Thus, he lacked the power or authority to perform police duties. While it remains true that "[m]isuse of power, *possessed* by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law," *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) (emphasis supplied), one cannot misuse power that one no longer possesses. Mr. Gibson responds to this criticism by pointing to language in some of the cases that speak of acting under "pretense" of law. Mr. Gibson argues that this "pretense" language indicates that "the color of law requirement is met if the person whose conduct is being considered pretended to act as a police officer even though he was not in fact so acting." Appellant's Br. at 15–16 (citing *Williams v. United States*, 179 F.2d 656, 661 (5th Cir.1950), *aff'd*, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951); *Crews v. United States*, 160 F.2d 746, 750 (5th Cir. 1947)). While it is no doubt true that an officer who, motivated by personal animus, misuses his lawfully possessed authority to injure the plaintiff may be found to be acting under color or "pretense" of law, *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945), we have found no authority for expanding this concept of "pretense" of law to encompass the actions of an official who possessed *absolutely no authority* to act but nonetheless assumed the position of an imposter in pretending that he did. In fact, *Screws*, the case most often cited as the fount of the "pretense" language, makes abundantly clear the distinction between, on the one hand, the misuse of power under pretense of law and, on the other, the actions of an officer who has no authority whatsoever to act. *Id.* In responding to criticism that the "misuse of power" formulation for "under color of law" was too broad and in contravention of Congress' true intent that "under color of law" should "include only action taken by officials pursuant to state law," the Court responded:

> But those statements [regarding Congress' perceived intent] in their context are inconclusive on the precise problem involved in the *Classic* case and in the present case. *We are not dealing here with a case where an officer not authorized to act nevertheless takes action.* Here the state officers were authorized

to make an arrest and to take such steps as were necessary to make the arrest effective. They acted without authority only in the sense that they used excessive force in making the arrest effective. *It is clear that under "color" of law means under "pretense" of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded.* Acts of officers who *undertake to perform their official duties* are included whether they hew to the line or overstep it. If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea.

*Id.* (emphasis supplied). Thus, *Screws* made clear that it was not addressing the situation of an official who was stripped completely of authority to act; such a situation does not constitute action under "pretense" of law.[12]

We, therefore, conclude that the district court correctly held that Officer Novit did not act under color of state law and that the section 1983 claim against Novit properly was dismissed.[13]

B. *Grants of Summary Judgment for the City and the Remaining Defendants*

1. The municipal liability claim [14]

■ Initially, we must stress the unusual posture in which we confront this claim. Discovery in this case has been limited exclusively to the issue of whether Officer Novit acted under color of law. This limitation on discovery would impose no impediment to the grant of summary judgment on the municipal liability claim if the determination of whether Novit acted under color of law were dispositive of the municipal liability claim. *See Korf v. Ball State Univ.,* 726 F.2d 1222, 1230 (7th Cir. 1984) (limitation on discovery before grant of summary judgment is appropriate if desired discovery is irrelevant to disposition of plaintiff's claim). However, our conclusion that Officer Novit did not act under color of state law does not permit summary judgment on the municipal liability claim. Mr. Gibson has alleged a municipal policy of inadequate procedures regarding the recovery of a deadly weapon and ammunition from an officer placed on medical leave as mentally unfit for duty. He also has alleged that the failure to promulgate adequate procedures constituted "deliberate indifference" to the rights of the decedent and was the cause of the decedent's death in deprivation of his constitutional rights. *See* R.1 at 7–8, ¶¶ 41–46. On a municipal liability claim, the City policy itself must cause the constitutional deprivation.[15] Therefore, the municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the "color of law" requirement under § 1983. In

---

12. We note that some courts have considered as part of its "color of law" analysis the victim's perceptions that the officer was acting under color of law. However, as the above discussion makes clear, such perceptions cannot be dispositive in a situation such as this in which the actor possessed absolutely no authority to act. *See Screws,* 325 U.S. at 111, 65 S.Ct. at 1040; *Classic,* 313 U.S. at 326, 61 S.Ct. at 1043; *Briscoe v. Lahue,* 663 F.2d 713, 721 n. 4 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

13. Because the district court dismissed all defendants in its disposition of the case, it also dismissed the pendent state law claim—a wrongful death claim—against Officer Novit. Because we are affirming the dismissal of the federal claim against Officer Novit, we agree that the pendent state claim properly was dismissed. *See Ross v. United States,* No. 89–3318, 910 F.2d 1422, 1430 (7th Cir.1990).

14. Our discussion of the municipal liability claim pertains both to the claim against the City and against Acting Superintendent of Police O'Grady in his official capacity. An official capacity suit against a municipal official is merely another way of asserting a claim against the municipality. *See Yeksigian v. Nappi,* 900 F.2d 101, 103 (7th Cir.1990).

15. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

short, under this theory of liability, Gibson contends that the City's policy of allowing a deranged police officer to retain his service revolver and bullets is the state action that deprived him of his life.[16] Consequently, the City is not entitled to summary judgment on the ground that Novit did not act under color of state law.

■ Although no discovery had been allowed with respect to Gibson's municipal liability claim, the district court nevertheless granted the City summary judgment on the claim. Consequently, the district court assessed the claim under summary judgment standards rather than on the standards applicable to judgment on the pleadings under Fed.R.Civ.P. 12(b)(6). In *DeMallory v. Cullen*, 855 F.2d 442, 445

(7th Cir.1988), where no discovery had been taken, we held that the district court's grant of summary judgment on only the pleadings amounted to a Rule 12(b)(6) dismissal and that the court's failure to follow the standards governing Rule 12(b)(6) dismissals was error. Thus, our review of Mr. Gibson's municipal liability and remaining claims must be limited to a determination of whether these claims properly were allowed to survive the defendants' earlier motions to dismiss under Rule 12(b)(6).[17]

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Authority*, 892 F.2d 583, 586 (7th Cir.1989). In reviewing a motion to dismiss under Rule 12(b)(6), "we must

---

**16.** *See Nishiyama v. Dickson County*, 814 F.2d 277, 279–83 (6th Cir.1987) (en banc) (sheriff's alleged "policy" of permitting unsupervised use of patrol car by inmate who murdered a citizen while in possession of the car constituted action under color of law and stated a substantive due process violation for purposes of a municipal liability claim); *see also Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir.1990) (in review of jury verdict imposing municipal liability on city for death of inmate who was killed by other inmates, court concluded that "[a]lthough neither the City nor any of its employees or agents actually killed Mark Berry, based on the evidence presented in this trial, 'a jury reasonably could conclude that the city's conduct was the moving force in bringing about the constitutional violation'") (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987)); *Ruge v. City of Bellevue*, 892 F.2d 738, 741 & n. 6, 742 (8th Cir.1989) (plaintiff sufficiently pleaded constitutional violation based on alleged inadequate policy, adopted with deliberate indifference, of shoring up ditches in which city employee was killed—such allegation satisfied the state action requirement for purposes of Rule 12(b)(6)); *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 724–725 (3d Cir.1989) (in suit against school district based on alleged sexual abuse perpetrated by school band director, court noted that, for purposes of the "color of law" requirement, it was immaterial whether the band director was acting under color of law; the suit was against the school district based on a policy or custom of reckless indifference to instances of known or suspected sexual abuse, and the school district was "incontestably acting under color of state law"), *cert. denied*, — U.S. —, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *cf. City of Los Angeles v. Heller*, 475 U.S. 796, 798–99, 106 S.Ct. 1571, 1572–73, 89 L.Ed.2d 806 (1986) (per curiam) (jury verdict concluding that police of-

ficer inflicted no constitutional injury on plaintiff necessitated dismissal of municipal liability claim against the city based on the actions of that officer); *Martinez v. California*, 444 U.S. 277, 284–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980) (state parole officials' release of parolee, who later killed third party, was deemed too attenuated to support claim that officials deprived plaintiff's decedent of life within meaning of the fourteenth amendment; Court expressly reserved the question, however, whether parole officer ever could be deemed to have deprived someone of life by action taken in releasing a parolee).

**17.** *See DeMallory*, 855 F.2d at 445; *see also Robison v. Canterbury Village, Inc.*, 848 F.2d 424, 426, 429 (3d Cir.1988) (although court treated 12(b)(6) motion as motion for summary judgment when affidavits were submitted on the motion, because discovery stay had precluded development of an alternate theory in opposition to summary judgment, the court remanded to allow discovery before any determination could be made based on that theory); *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 831 n. 2 (9th Cir.1983) (noting that, where discovery had been stayed and plaintiff had not been given opportunity to develop facts in opposition to summary judgment motion, it would have been error for the court to rely on any deficiency in the plaintiffs' factual showing in opposition to the defendants' summary judgment motion); *Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n*, 365 F.Supp. 975, 981 (E.D.Pa.1973) (although 12(b)(6) motions supported by affidavits could be considered as Rule 56 motions for summary judgment, because discovery proceedings had been stayed, it would be "patently unfair" to grant summary judgment for the defendants when the plaintiff had yet to exercise its opportunities for pretrial discovery).

accept as true all the plaintiff's well-pleaded factual allegations and the inferences reasonably drawn from them. We shall affirm the dismissal only if the plaintiff has failed to allege any set of facts upon which relief may be granted." *Yeksigian v. Nappi,* 900 F.2d 101, 102 (7th Cir.1990) (citations omitted).

▪ As noted above, Mr. Gibson has alleged a municipal "policy" of inadequate procedures regarding the recovery of a deadly weapon and ammunition from officers placed on medical leave as mentally unfit for duty.[18] He also has alleged that the City's failure to promulgate adequate procedures to recover weapons and ammunition from officers it knew were mentally unfit for duty constituted "deliberate indifference" to the rights of the decedent and

was the cause of the decedent's death in deprivation of his constitutional rights. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989). Such inadequacies may be said to constitute a "policy" for which the City is responsible if "the need for more or different [procedures] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* 109 S.Ct. at 1205. Given the standard under which we must review Mr. Gibson's claims at this point in the litigation, and under the particular facts of this case, we believe that Mr. Gibson has pleaded sufficient facts to survive the defendants' motion to dismiss.[19]

18. Although the district court noted that Novit owned the weapon, the record also reflects that the City seized and destroyed the weapon after the shooting. *See supra* note 3. The record does not establish whether Novit had any authority to carry the weapon other than his membership in the police force.

19. In some respects, the facts alleged in this case present a stronger case than the facts in *City of Canton.* Unlike *City of Canton,* this case does not involve the failure to train officers in order to deal with various contingencies. Instead, it involves the municipality's alleged failure to disarm an employee—whom the City had armed and trained in the use of deadly force—after the City had determined that the employee was unfit for duty and had stripped that employee of all other authority.

Our disposition is also quite compatible with *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Supreme Court held that county authorities who had learned that a child was at risk of being abused by his father committed no constitutional violation by their failure to act to prevent the abuse. The Court reasoned that nothing in the due process clause requires the state to protect its citizens' life, liberty, and property "against invasion by *private* actors." *Id.* 109 S.Ct. at 1003 (emphasis supplied). In determining that the county officials had not violated any constitutional right of the victim, the Court expressly noted that the state had "played no part in [the] creation [of the dangers faced by the victim], nor did it do anything to render him more vulnerable to them." *Id.* 109 S.Ct. at 1006. It is in this important respect that the present case differs considerably from *DeShaney.* At this point in the litigation, where we are obliged to accept as true the plaintiff's factual allegations, the City is alleged to have played a part in both creating

the danger (by training and arming officer Novit) and rendering the public more vulnerable to the danger (by allowing Novit to retain his weapon and ammunition after it otherwise stripped him of his authority as a policeman). *See Ross v. United States,* 910 F.2d 1422 (7th Cir.1990) (plaintiff whose son drowned stated § 1983 claim against county based on policy that required rescue to be made only by county personnel despite the absence of any qualified county personnel and the presence of other qualified rescuers); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979) (the minor plaintiffs, who had been riding in their uncle's car, stated a § 1983 cause of action against the police for abandoning them in their uncle's parked vehicle on the side of a busy highway on a cold evening); *cf. Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988) (en banc) (no § 1983 action based on failure to provide rescue services), *cert. denied,* —— U.S. ——, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); *Jackson v. City of Joliet,* 715 F.2d 1200, 1206 (7th Cir.1983) (no § 1983 action based on officers' alleged negligence in failing to provide rescue assistance at accident scene), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984); *Bowers v. DeVito,* 686 F.2d 616, 617–18 (7th Cir.1982) (no § 1983 action against state mental health officials for releasing mental patient who subsequently committed a murder).

Moreover, we do not think that *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), dictates a different result at this stage of the litigation. In *Martinez,* parole officials were sued under § 1983 for their alleged causal role in the murder of a young girl at the hands of a parolee whom the officials had released. The Supreme Court upheld a dismissal of the complaint on grounds that the parole board's actions were too attenuated from the

We, however, offer no opinion on the underlying merits of Mr. Gibson's municipal liability claim. It is well established that the requirements for municipal liability based on policies of "inadequacy" are rigorous. As noted in *City of Canton*, municipalities may be held liable for "inadequate" policies "only where the failure ... amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* 109 S.Ct. at 1204; *cf. Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985) (for purposes of the eighth amendment's prohibition on cruel and unusual punishment, the "deliberate indifference" standard of culpability means either "deliberateness," or "recklessness" in the criminal law sense—both terms imply the defendants' knowledge of the risk of deprivation), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). *See also City of Canton*, 109 S.Ct. at 1208 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.").[20] Per-

injury to conclude that the parole officers had deprived the victim of a constitutionally protected interest. *Id.* at 285, 100 S.Ct. at 559. The asserted linkage between the government action and the alleged deprivation is stronger here than it was in *Martinez,* because in this case the police department played a more significant role in creating the potential danger. Here, the police affirmatively trained and outfitted one of its employees with the means to exercise deadly force, yet failed to recover that equipment from its employee after it had determined that the employee was unfit to exercise police authority. This circuit has recognized that the government may face liability if it plays a role in creating the danger faced by a potential victim. *See Bowers,* 686 F.2d at 618 ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."). Although the Court in *Martinez* also suggested that the linkage between the government action and the ultimate injury might be greater if the government is aware of danger to a particular individual, as opposed to society at large, *see* 444 U.S. at 285, 100 S.Ct. at 559, some types of injuries, by their very nature, will choose their victims at random. *See, e.g., Nishiyama v. Dickson County,* 814 F.2d 277, 279–83 (6th Cir.1987) (*en banc* ) (inmate to whom sheriff gave unsupervised use of patrol car murdered citizen); *Ruge v. City of Bellevue,* 892 F.2d 738, 739–40 (8th Cir.1989) (city's ditches caved in on unsuspecting city employee); *see also Bowers,* 686 F.2d at 620 (Wood, Jr., J., dissenting) (questioning the value of the requirement that officials have knowledge of danger to a particularized victim in cases where released mental patients [who presumably exercise little "criminal discretion"] commit crimes upon members of the public).

**20.** Certainly, not all inadequacies in city policy are so "obvious" and so likely to result in constitutional injuries that plaintiffs can expect even to cross the pleadings threshold by asserting boilerplate allegations of inadequate policy. *Cf. Strauss v. City of Chicago,* 760 F.2d 765, 767–70 (7th Cir.1985) (boilerplate *Monell* allegations, unsupported by any facts suggesting the existence of a policy, are insufficient to survive a motion to dismiss). In this case, by contrast, we have factual allegations that the City knew of an obvious risk that it played a role in creating, yet did not recover the means by which a likely injury would be inflicted.

In *Oklahoma City v. Tuttle,* 471 U.S. 808, 820–24, 105 S.Ct. 2427, 2434–37, 85 L.Ed.2d 791 (1985) (the Court held that where the "policy" relied upon to establish municipal liability is not itself unconstitutional, considerably more proof than a single incident is necessary to allow a municipal liability claim to go to the jury). The rationale behind the requirement that a "pattern" be shown in certain instances is to prevent municipalities from being held liable on a *respondeat superior* basis in contravention of *Monell. See id.* at 818, 823, 105 S.Ct. at 2433, 2435; *see also Strauss,* 760 F.2d at 767 (mere allegations of an isolated incident of misconduct by an employee without facts suggesting the existence of a policy are insufficient to state a municipal liability claim); *Rodriguez v. Avita,* 871 F.2d 552, 554–55 (5th Cir.) (claim based solely on single shooting incident by a police officer was insufficient to establish the official policy requisite to municipal liability), *cert. denied,* ____ U.S. ____, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989). In this case, however, we do not have an attempt to disguise a *respondeat superior* claim as a municipal liability claim. The plaintiff does not ask us to infer the existence of a policy based on an isolated incident of police misconduct. Indeed, the City does not deny that it both had and executed a policy for dealing with officers it determined were mentally unfit for service. The issue in this case is not whether the City had a policy, but whether the City's policy was *inadequate* (i.e., did not go far enough) in addressing the risk the policy was designed to prevent. Thus, because it is clear that Mr. Gibson is seeking to hold the City liable only for its own actions, the policy concerns

haps Mr. Gibson will not be able to show that the City's "inadequate" policies constituted "deliberate indifference" as required in order to impose municipal liability, but, on these facts, we conclude that he must at least be given the opportunity to conduct discovery on the issue. After such an opportunity has been afforded on remand, the City may move for summary judgment on this issue.

## 2. The supervisory liability claim against O'Grady in his individual capacity

■ We conclude that the district court's grant of summary judgment on this claim also was premature. As noted above, Mr. Gibson was precluded from conducting discovery on any issue other than color of law; thus, the supervisory liability claim against O'Grady before us is, in effect, in the form of a motion to dismiss—a motion denied earlier by the district court.

This claim against O'Grady stands on similar ground to the municipal liability claim. In order to hold O'Grady liable as a supervisor, Mr. Gibson must prove O'Grady's personal involvement in the wrongful conduct, which, in a case alleging a failure to detect and prevent a subordinate's misconduct, means that the supervisor must act at least with deliberate indifference toward the misconduct. See Jones v. City of Chicago, 856 F.2d 985, 992–93 (7th Cir. 1988). Although Mr. Gibson has alleged that O'Grady acted with deliberate indifference in failing to promulgate adequate procedures for the recovery of deadly weapons from a mentally unfit officer, he has not had an opportunity to conduct discovery on that issue. We express no opinion on the underlying merits of this claim. We conclude only that summary judgment on the claim at this stage of the litigation was inappropriate.

behind the requirement that a plaintiff plead multiple incidents of unconstitutional conduct are not present in this case. Cf. Strauss, 760 F.2d at 768 ("The existence of a policy that caused a plaintiff's injury is an essential part of Section 1983 liability, so that some fact indicating the existence of some such policy must be pled.").

## 3. The cover-up claims against O'Grady, Marowally, and Gray

■ The victims of a cover-up are the decedent's survivors, not the decedent himself. Bell v. City of Milwaukee, 746 F.2d 1205, 1264 (7th Cir.1984). Thus, Mr. Gibson's allegations that the decedent's constitutional rights were violated will not support his cover-up claim against O'Grady, Marowally, and Gray. Mr. Gibson's complaint alleges only in the vaguest terms that Marowally and Gray filed false police reports "in an effort to cover-up police misconduct committed by Defendant NOVIT," and "in order to protect Defendant Novit from civil and/or criminal liability." R.1 at 6, ¶¶ 37–38. Similarly, he alleges that O'Grady took action "to curtail any further investigation of Defendant NOVIT and the possible bringing of further charges, civil or criminal, against him." Id. at ¶ 33. Mr. Gibson does not, however, allege any concrete injury to the decedent's survivors resulting from these alleged cover-up activities. See Bell, 746 F.2d at 1261 (explaining that a cover-up can interfere with a decedent's survivors' due process right of access to the courts). Even assuming that Mr. Gibson sufficiently has alleged that the initial police reports filed by Officers Marowally and Gray were intentionally false and inaccurate, the subsequent investigation by the OPS concluded that Novit's shooting was unjustifiable. Mr. Gibson has alleged no injury to himself or the decedent's other survivors resulting from the delay between the time the initial police reports were filed and the filing of the OPS report.[21] We conclude that Mr. Gibson has pleaded no facts that would entitle him to a finding that the acts of Marowally or Gray denied him access to the courts or could causally contribute to his failure in this

21. See Karim–Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 625 (9th Cir.1988) (dismissing as unripe for adjudication a § 1983 cover-up claim on grounds that whether the plaintiff has a federally cognizable cover-up claim would depend on whether plaintiff lost the present lawsuit and could show that the acts of the alleged cover-up defendants were causally connected to a failure to succeed in the present lawsuit).

litigation.[22]

Similarly, Mr. Gibson's cover-up claim against O'Grady must be dismissed. The facts alleged show that O'Grady, far from attempting to cover up any misconduct, initiated disciplinary proceedings against Novit after the OPS report concluded that Novit had violated departmental rules and wrongfully had shot the decedent. Moreover, Mr. Gibson alleges no injury to the decedent's survivors as a result of O'Grady's alleged misconduct.[23]

## Conclusion

For the foregoing reasons, the dismissal of Officer Novit is affirmed. The grants of summary judgment in favor of the City and O'Grady on the municipal liability claim are reversed, as is the grant of summary judgment for O'Grady in his individual capacity on the supervisory liability claim. The grants of summary judgment in favor of O'Grady, Marowally, and Gray on the cover-up claims are affirmed.

AFFIRMED IN PART AND REVERSED IN PART

---

**22.** Because Mr. Gibson has alleged no basis for municipal liability on the cover-up claims against Marowally and Gray, any cover-up claim against Marowally and Gray in their official capacities also must be dismissed. *See Hadi v. Horn,* 830 F.2d 779, 783 (7th Cir.1987).

**23.** Because Mr. Gibson has alleged no basis for municipal liability on the cover-up claim against O'Grady, any cover-up claim against O'Grady in his official capacity also must be dismissed. *See supra* note 22.